Karl W. SONNEMAN, Appellant,

v.

**BLUE CROSS AND BLUE SHIELD OF MINNESOTA, State of Minnesota, Respondents.**

No. C3-86-1737.

Court of Appeals of Minnesota.

April 7, 1987.

George B. Wyeth, Leonard, Street & Deinard, Minneapolis, for Karl W. Sonneman.

Jeanne Unger, Gregory M. Weyandt, Rider, Bennett, Egan & Arundel, Minneapolis, for Blue Cross and Blue Shield of Minnesota.

Hubert H. Humphrey, III, Atty. Gen., Alan C. Page, Sp. Asst. Atty. Gen., St. Paul, for State.

Heard, considered and decided by POPOVICH, C.J., and NIERENGARTEN and STONE,* JJ.

---

* Acting as Judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

## OPINION

STONE, Judge.

This declaratory judgment case involves (1) the right of a State employee, appellant Karl W. Sonneman, to continue receiving benefits under a health insurance contract in effect when he initiated treatment for a psychological disorder, (2) the right of the health care provider, respondent Blue Cross and Blue Shield of Minnesota, to drastically reduce such benefits and (3) the authority of the respondent, State of Minnesota, to enter into a contract allowing for such reductions.

The matter was submitted to the trial court on a record of stipulated facts and upon cross-motions for summary judgment. On July 18, 1986, the trial court entered declaratory judgment in favor of Blue Cross and the State. Sonneman appeals from that judgment. We affirm.

## FACTS

Sonneman has been employed as an attorney with the Minnesota Attorney General's office since 1982. At the commencement of his employment, he elected group health insurance coverage with Blue Cross from among a number of different health insurance packages offered to State employees. In May 1983, on recommendation of a psychiatrist, Sonneman began undergoing psychoanalysis for an obsessional character disorder. The course of analysis planned at that time consisted of four 45-minute sessions per week, extending over a period of several years.

Three health service contracts are at issue in this case:

(1) The 1981 contract (effective from 10/81–10/83). Sonneman commenced psychoanalysis while this contract was in force. Under the major medical provision of the policy, Sonneman was obligated to pay 20% of the first $5,000 of covered services in excess of the $100 deductible. Blue Cross then paid 100% of covered expenses exceeding $5,000 "as the result of an illness" with a lifetime maximum benefit of $500,000. "Illness," defined by the policy, included "a condi-

tion involving bodily or mental disorder of any kind";

(2) The 1983 contract (effective from 10/83–10/85). While substantially identical to the relevant provisions of the 1981 policy, this new policy required the subscriber to pay 20% of the first $5,000 in covered services (beyond the $100 deductible) on an *annual* basis. Blue Cross paid 100% of covered services exceeding $5,000 each year, including treatment of "[n]ervous [d]isorders." Sonneman continued to receive benefits under this policy without objection; and

(3) The 1985 contract (effective from 10/85–10/87). This policy drastically reduced mental health coverage. Blue Cross will now only pay 80% of the first $750 per year in expenses or a maximum of $600 per year.

The terms of group health contracts available to State employees are determined through collective bargaining negotiations between the State and its employee unions. Sonneman and other State employees who are not affiliated with unions are unrepresented in these negotiations, but do receive the same benefit packages negotiated with the unions. During the 1985 collective bargaining negotiations, the employee unions sought an overall increase in medical service coverage desired by a majority of union members. To obtain these additional coverages but contain the cost, it was agreed that outpatient mental health coverage, received by a minority of State employees, would be substantially reduced.

As a result, the 1985 policy went into effect. Sonneman exhausted his benefits under the 1985 contract during the first month of coverage. He then terminated treatment but recently resumed limited treatment at his own expense.

Both the 1981 and the 1983 contracts under which Sonneman was insured specifically provided at Part VII that individual coverage under the contract terminated on the earliest date of the listed conditions, including "[t]he date the * * * Contract ends." Additionally, the last paragraph of Part IV of these policies states that major medical coverage would be extended after

termination of the policy for persons who are *"[t]otally disabled"* at that time "for up to 18 months after the date coverage ends." (Emphasis supplied.)

In entering declaratory judgment for Blue Cross and the State, the trial court concluded:

1. The relevant Blue Cross and Blue Shield of Minnesota * * * contracts are not ambiguous.

2. These BCBSM contracts are health service contracts.

3. Under the express terms of these BCBSM health service contracts, plaintiff is entitled to benefits for health services only when such services are received, regardless of the date of inception, of plaintiff's illness.

4. Plaintiff's rights to mental health care benefits did not vest as of the time of the diagnosis of his nervous disorder and the onset of treatment in April and May of 1983.

5. That plaintiff's entitlement to health care benefits for outpatient mental illness is governed by the group health services contract between Blue Cross and Blue Shield of Minnesota and the State of Minnesota which became effective October 2, 1985.

6. Plaintiff is not entitled to the Declaratory Relief sought by his complaint * * * and * * * defendants Blue Cross and Blue Shield of Minnesota and State of Minnesota are entitled to judgment in their favor.

Sonneman appeals from this judgment.

## ISSUES

1. Did the trial court err in determining that Sonneman's right to continuing outpatient mental health care benefits was governed by the 1985 contract?

2. Are Sonneman's arguments pertaining to application of the reasonable expectations doctrine, right of conversion to an individual policy and denial of equal protection properly raised on appeal?

## ANALYSIS

### I

Interpretation of contract provisions is a question of law and, unlike matters involving questions of fact, this court need not defer to the trial court's judgment. *See Lamb Plumbing & Heating Co. v. Kraus Anderson of Minneapolis, Inc.,* 296 N.W.2d 859, 862 (Minn.1980); *Madden v. Home Insurance Co.,* 367 N.W.2d 676 (Minn.Ct.App.1985) (reviewing court need not defer to trial court's conclusions of law where facts are stipulated or undisputed).

Sonneman contends that his right to receive mental health benefits vested under the 1981 contract, the contract in existence at the time of his diagnosis and onset of treatment in May 1983. Blue Cross argues that the 1983 contract is the proper basis for comparison of benefits since Sonneman voluntarily accepted reduced mental health benefits under that contract without objection. As a practical matter, this distinction is largely unimportant since the result in this case would not change irrespective of whether the 1981 contract or the 1983 contract is utilized as the point for comparison of benefits. Moreover, as illustrated previously, provisions in the 1981 and 1983 contracts relating to mental health coverage are virtually identical. For purposes of this discussion, however, we believe benefits, as defined in the 1983 contract and not those set out in the 1981 contract, provide the proper focal point. It is well established that conduct, as well as verbal communication, may constitute acceptance of an offer and that silence may also constitute acceptance where a duty to deny otherwise exists. *Rosenberg v. Townsend, Rosenberg & Young, Inc.,* 376 N.W.2d 434, 437 (Minn.Ct.App.1985). Sonneman's adherence to the terms of the 1983 contract, without objection, constitutes an acceptance of benefits as defined by this contract. Accordingly, reference will be made throughout this analysis to the 1983 contract.

Sonneman contends that language in Part IV of the group health contract providing for a lifetime aggregate maximum of $500,000 in major medical coverage (in-

cluding mental health benefits) demonstrates that Blue Cross intended to provide coverage for the duration of major medical treatment commenced when the policy was in effect. The 1983 contract specifically provided:

> The aggregate of the benefits payable under this Major Medical Coverage starting October 1, 1971 for *each person covered through his or her lifetime will not exceed an aggregate maximum of $500,000.*

Sonneman alternatively argues that if ambiguous, this language should be construed against Blue Cross, drafter of the agreement. *See Nordby v. Atlantic Mutual Insurance Companies*, 329 N.W.2d 820, 822 (Minn.1983).

Sonneman further points to limitations in the 1983 contract relating to hospital services which states that treatment must be received "while coverage is in force" and to medical surgical services, which states that benefits are available "while covered under the Contract." He argues that since similar limitations do not appear in the 1985 contract, the 1983 contract must be construed as providing coverage on an individual basis for conditions arising during the contract period. Finally, Sonneman relies on *Fields v. Blue Shield of California*, 163 Cal.App.3d 570, 209 Cal.Rptr. 781 (1985), and cases from other jurisdictions holding that an insured's right to benefits vested under previous health service contracts and could not be revoked by subsequent contract modifications. *See Danzig v. Dikman*, 53 N.Y.2d 926, 440 N.Y.S.2d 925, 423 N.E.2d 402 (1981); *Houghton v. American Guaranty Life Insurance Co.*, 692 F.2d 289 (3d Cir.1982); *Myers v. Kitsap Physicians Service*, 78 Wash.2d 286, 474 P.2d 109 (1970).

While at first glance this reasoning appears persuasive, a closer examination reveals that the 1983 contract, when viewed in its entirely, is unambiguous and that the cases relied upon by Sonneman as authority for a "vesting right" rule are distinguishable.

From the outset, we must reject Sonneman's underlying premise that the 1985 contract "eliminated" or "revoked" mental health benefits and that the State acted arbitrarily and capriciously in doing so. The State is expressly authorized by statute to *reduce* group insurance benefits.

> A person covered under group life, group accidental death and dismemberment, group disability income or group medical expense insurance, shall not be denied benefits to which he is otherwise entitled solely because of a change in the insurance company writing the coverage or in the group contract applicable to the person. In the case of one or more carriers replacing or remaining in place after one or more plans have been discontinued, each carrier shall accept any person who was covered under the discontinued plan or plans without denial of benefits to which other persons in the group covered by that carrier are entitled. "Insurance Company" shall include a service plan corporation under chapter 62C or 62D.
>
> The commissioner shall promulgate rules to carry out this section. *Nothing in this section shall preclude an employer, union or association from reducing the level of benefits under any group insurance policy or plan.*

Minn.Stat. § 60A.082 (1984) (emphasis supplied).

■ While it is clear that mental health coverage was substantially diminished under the 1985 contract, it was not eliminated or revoked. Blue Cross continues to pay 80% of the first $750 in mental health charges or a maximum of $600 per year. The record establishes that this reduction in mental health coverage was negotiated during collective bargaining meetings with full knowledge of its potential impact on a minority of State employees receiving these benefits. When, as here, the State, as employer, acts in accordance with law, and reduces specific benefits to enable broader coverage desired by a majority of State employees, it does not act in an arbitrary or capricious manner.

■ The phrase "covered through his or her lifetime" contained in the 1983 contract does not *create* maximum lifetime coverage

in the aggregated amount of $500,000 for conditions diagnosed and treated while the policy was in effect, but rather defines the maximum benefit allowed if one is insured with Blue Cross throughout his or her lifetime, regardless of the circumstances. A contrary reading would render meaningless the policy provisions entitled "Termination of Individual Coverage" and "Extended Coverage," which provide in relevant part:

Extended Coverage

If the coverage for You or Your Dependent ends for any reason other than the Aggregate Maximum being reached or the Participant Subscriber's failure to pay the required charge, coverage will be extended for a person who is Totally Disabled and under the care of a Doctor of Medicine. The extension of coverage will continue as long as the person is Totally Disabled and under the care of a doctor of medicine for up to 18 months after the date coverage ends.

\* \* \* \* \* \*

**TERMINATION OF INDIVIDUAL COVERAGE**

Coverage under the Contract will end on the earliest of the following dates:

A. The date the AWARE Contract ends [October 2, 1985] \* \* \*.

■ These provisions clearly and unambiguously provide that coverage, as defined under the 1983 contract, ended on October 2, 1985 *unless* the condition giving rise to treatment left the insured "totally disabled." The contract defines total disability as:

1. the time during which You, because of injury or sickness, are unable to perform every duty of your occupation and do not engage in any occupation for profit.

2. the time during which Your Eligible Dependents because of injury or sickness, are unable to perform all the activities of a normal person of like age and sex or are Hospital confined.

Sonneman plainly does not qualify as totally disabled. He continues to work as an attorney and has done so since he commenced psychiatric treatment. *See Bartu-*

*lis v. Metropolitan Life Insurance Co.*, 72 Ill.App.2d 267, 218 N.E.2d 225 (1966) ("totally disabled" is determined "on the termination date of the policy." 218 N.E.2d at 226). *See also Wulffenstein v. Deseret Mutual Benefit Association*, 611 P.2d 360 (Utah 1980) (plaintiff, insured under group hospital, surgical and medical policy, injured in accident not entitled to reimbursement of expenses following termination of employment. The court held that the policy was a medical expense *not* accident policy and that expenses incurred after policy ended, unlike accident policies, were not covered); *Blue Cross of Florida, Inc. v. Dysart*, 340 So.2d 970 (Fla.Dist.Ct.App. 1976) (expenses related to car accident ultimately causing death not covered beyond cancellation of Blue Cross medical, surgical and hospitalization contract). While we are not unsympathetic to Sonneman's attempts to balance his private needs and public responsibilities, we cannot ignore the unambiguous wording of the contract and the well recognized rule of "expressio unius est exclusio alterius"—that when certain items are specified in a contract, an intention to exclude all others from its operation may be inferred. *Maher v. All Nation Insurance Co.*, 340 N.W.2d 675, 680 (Minn.Ct. App.1983).

■ For similar reasons, we decline to adopt a "vesting right" rule as found in other jurisdictions, most notably by the California Court of Appeal in *Fields v. Blue Shield of California*, 163 Cal.App.3d 570, 209 Cal.Rptr. 781 (1985).

In *Fields*, the initial group health contract at issue provided for a " 'lifetime maximum' benefit payable 'for treatment of nervous and mental illness' of $50,-000." When modified the next year, the contract excluded coverage for psychological treatment when "credited toward earning a degree \* \* \*." *Fields*, 209 Cal.Rptr. at 784. Fields, a physician who began psychoanalysis based on medical diagnosis and later decided to become a psychotherapist, continued receiving psychoanalysis as part of his training requirement. Blue Cross continued to pay these expenses for two years after the exclusion was in effect.

When benefits ceased, the physician brought suit to recover damages arising from the insurers refusal to pay. In holding the insurer liable for reimbursement of expenses, the court determined that notice of termination of benefits was inadequate and that language in the original contract pertaining to exclusion of benefits that also qualified the recipient for certification was ambiguous. The court further determined that language in the original contract which granted benefits for psychiatric services, including "the lifetime maximum Supplemental Benefits payable for treatment of nervous and mental illness [of] $50,000 for each subscriber," evidenced a clear contractual intent by Blue Cross to provide a $50,000 lifetime maximum once treatment for a specific mental illness was begun. 209 Cal.Rptr. at 790. "These benefits, up to $50,000 * * * became vested as a matter of legal and contractual right * * *." *Id.*

Significantly, the group health contract in *Fields,* in contrast to the present case, did not contain an "Extended Coverage" provision precisely defining what benefits would extend beyond termination of the policy. Further, Sonneman makes no claim that notice of reduction in benefits was inadequate and, in fact, concedes that notice was appropriate in his memorandum to the trial court.

Other decisions relied upon by Sonneman as support for adoption of a "vesting right" rule are similarly distinguishable since none of the group health contracts in those cases contained a provision similar to the "Extended Coverage" provision in the present case. *See e.g. Danzig v. Dikman,* 78 A.D.2d 303, 434 N.Y.S.2d 217 (1980) (nursing care commenced under "unlimited" lifetime maximum subsequently modified to a lifetime maximum of "$5,000," *Id.* at 218); *Myers v. Kitsap Physicians Services,* 78 Wash.2d 286, 474 P.2d 109 (1970) (treatment for kidney condition initialed under group insurance provision stating that the insurer "will furnish during *any* certificate year all necessary medical, surgical and hospital services" ambiguous. *Id.* at 111 (emphasis supplied)). *Compare Houghton v. American Guaranty Life Insurance Co.,* 692 F.2d 289 (3d Cir.1982) (*in-dividual* policy providing coverage for "loss" resulting from injury or sickness was ambiguous when "loss" was not defined and could have included ongoing medical expenses after the policy ended).

Moreover, we believe that adoption of a "vesting right" rule would create an administrative nightmare. A number of questions would remain unresolved, including:

(1) the definition of the vesting "right" —"Does it embrace the right to all services available in the future or is it limited to those available and received while plan coverage was in effect? Do future deductible amounts apply? What effect do co-payment changes have?";

(2) What effect would a vesting right have on changes in health plan coverages due to "changing needs, increasing costs [and] employer resistance or financial ability to absorb higher premiums?"; and

(3) a vesting right would require exclusions for pre-existing conditions "[o]therwise, the carrier would be required to pay whether or not a person continues to be covered by the plan or pays a premium for the coverage. This necessarily would require substantial administrative costs to be sure the preexisting condition is not covered and would modify present 'waiting periods' before a pre-existing condition is covered."

*Fields,* 209 Cal.Rptr. at 800 (dissent).

**II**

Arguments not presented to the trial court will not be considered for the first time on appeal. *Woody v. Krueger,* 374 N.W.2d 822, 824 (Minn.Ct.App.1985). It is clear that arguments pertaining to application of the reasonable expectations doctrine, right to conversion and equal protection were not specifically raised before the trial court. Sonneman argues, however, that since the trial court found that neither Blue Cross nor the State was liable for the psychiatric expenses at issue, it decided these issues by *implication.* This argument is tenuous at best. While we note that these issues were not properly preserved for appellate review, even if addressed on the merits, Sonneman's arguments would fail.

■ The reasonable expectations doctrine does not apply since the policy here does not contain a "hidden exclusion" in the definitions section as in *Atwater Creamery Co. v. Western National Mutual Insurance Co.*, 366 N.W.2d 271 (Minn. 1985). The "Extended Coverage" section is prominently displayed in Part IV of the policy.

Under Part VIII of the contract, "conversion privilege" is limited to the following:

A. Your ceasing full-time employment;

B. Your employer terminating coverage with us and *not replacing it with other group coverage;*

C. Your Dependent no longer qualifying as an Eligible Dependent * * *.

(Emphasis supplied.) Sonneman does not qualify under any of these conditions. Although benefits for mental health services have been drastically reduced, this is not the same as termination of coverage without "replacing it with other group coverage."

■ Finally, substantial reduction in mental health benefits does not constitute a denial of equal protection. Since neither a suspect classification nor a fundamental right is involved, the state action being challenged is subject to review under the rational basis test. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Sonneman has not produced evidence that the State, in negotiating the new Blue Cross contract, has acted in an arbitrary or unreasonable manner. On the contrary, it had a rational basis for its decision. We do not review the desirability of State contracts, only the legality.

## DECISION

The trial court did not err in entering declaratory judgment for Blue Cross and the State.

Affirmed.