[No. C029483. Third Dist. May 28, 1999.]

KENT WILLIAMS et al., Plaintiffs, Cross-defendants and Appellants, v. CALIFORNIA PHYSICIANS' SERVICE, Defendant, Cross-complainant and Respondent.

724

## COUNSEL

Law Offices of Robert K. Scott, Robert K. Scott, Christian J. Garris; D. Scott Mohney; Mart & deVries, Douglas K. deVries; Law Offices of Randy D. Curry and Randy D. Curry for Plaintiffs, Cross-defendants and Appellants.

Foley & Lardner, Mark E. Reagan, Lowell C. Brown, Hema Rao Anwar; Sturgeon, Keller, Phillips, Gee & O'Leary and Delbert C. Gee for Defendant, Cross-complainant and Respondent.

## OPINION

**SIMS, Acting P. J.**—Plaintiffs Kent and Marjorie Williams appeal from summary judgment in favor of defendant California Physicians' Service, doing business as Blue Shield of California (hereafter Blue Shield), in plaintiffs' action alleging breach of contract and breach of the duty of good faith and fair dealing based on defendant's refusal to pay for physical therapy for plaintiff Marjorie Williams under defendant's health care service plan (the Plan). Plaintiffs contend the right to therapy "vested" on the date of injury and cannot be restricted by subsequent amendment of the contract upon its renewal. We shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 18, 1991, plaintiff Marjorie Williams was injured in an aircraft accident, assertedly rendering her an "incomplete quadriplegic." At the time

of the accident, plaintiffs were individual subscribers in the Plan with Blue Shield providing a maximum aggregate coverage of $2 million.[1] (Plaintiffs assert on appeal that the Plan became effective May 8, 1991, but they cite no supporting evidence, and the complaint alleged the Plan was issued on or before March 1, 1991.) At the time of the accident, the Plan had no specific limit on physical therapy required for treatment of injury (except that in-home services had a limitation of $10,000 per year).

At the beginning of the Plan, immediately following the table of contents and before the introduction, the following paragraph was set off from the rest of the text, in boldface type, at the top of the first page of the text of the Plan:

"IMPORTANT!

"No person has the right to receive the benefits of this plan for Services furnished following termination of coverage. Benefits of this plan are available only for Services furnished during the term it is in effect and while the individual claiming the benefits is actually covered by this Agreement. Benefits may be modified during the term of this plan as specifically provided under the terms of this Agreement or upon renewal. If benefits are modified, the revised benefits (including any reduction in benefits or the elimination of benefits) apply for Services furnished on or after the effective date of the modification. There is no vested right to receive the benefits of this Agreement."

The Plan also included a section labeled "Duration of the Agreement," which provided for membership in the Plan to be renewed every three months as long as dues are paid. The Plan provided: "Renewal is subject to Blue Shield's right to amend this Agreement. Any change in dues or benefits are effective after 30 days notice from date of mailing . . . ." The Plan allowed for termination under specified circumstances not at issue in this case.

On July 17, 1992, Blue Shield submitted to the Department of Corporations, for review and approval, proposed revisions to its individual preferred plan, which included the Plan to which plaintiffs were subscribers. The proposed revisions included an increase in the maximum aggregate payment

---

[1] The Plan provided: "MAXIMUM AGGREGATE PAYMENT [¶] 1. The maximum aggregate payment amount is $2,000,000.00. No benefits in excess of this amount are provided to or on behalf of any Person. [¶] 2. The maximum aggregate payment amount is determined by aggregating all Blue Shield benefits provided for or on behalf of any Person, either as a Subscriber or a Dependent, pursuant to this Agreement, or any prior or subsequent Agreement between the Subscriber and Blue Shield."

under the contract from $2 million to $3 million, and a limitation of outpatient physical therapy services to a maximum of $1,000 per year. On August 17, 1992, the Department of Corporations approved Blue Shield's revisions.

Blue Shield issued an endorsement to the Plan (including plaintiffs) that increased the maximum aggregate from $2 million to $3 million but limited physical therapy benefits to an annual maximum of $1,000 per year. By its own terms the endorsement became effective on October 1, 1992, or on the subscriber's renewal date, whichever was *later*.

Thereafter, plaintiffs sought coverage for physical therapy services over the amended limit, but Blue Shield denied plaintiffs' requests.

On May 18, 1995, plaintiffs filed this action alleging breach of contract and breach of the duty of good faith and fair dealing, concerning Blue Shield's refusal to pay for plaintiff Marjorie Williams's physical therapy.[2] Blue Shield filed a cross-complaint for declaratory relief to obtain a judicial determination that plaintiffs are bound by the contract as amended.

In July 1997, Blue Shield moved for summary judgment as to the complaint and/or the cross-complaint, on the grounds Blue Shield had the right to modify the insurance contract, and plaintiff Marjorie Williams did not have a vested right to continued unlimited physical therapy benefits.

Plaintiffs opposed the motion, asserting plaintiff Marjorie Williams's rights vested on the date of her accident, the contract was ambiguous, and the clause relied upon by Blue Shield should be held unconscionable.

After a hearing, the trial court denied Blue Shield's motion for summary judgment as to plaintiffs' complaint but granted Blue Shield summary judgment on the cross-complaint for declaratory relief. The court determined that Blue Shield could reduce the benefits pursuant to the terms of its Health Service Agreement, which contained a clear and conspicuous advisement to that effect.

The parties settled their differences as to other matters and entered into a stipulated judgment in favor of Blue Shield, with plaintiffs retaining their right to appeal.

---

[2]The complaint also alleged Blue Shield had delayed processing her claims beginning in early 1992. This allegation is not at issue on appeal.

## DISCUSSION

### I. Standard of Review

Summary judgment is granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Villa* v. *McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719].) Our review is de novo. (*Ibid.* [summary judgment review]; *Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619] [interpretation of insurance plan is question of law].)

### II. No Vested Right

▮ Plaintiffs contend the Plan afforded a right to unlimited physical therapy (up to the maximum aggregate), which "vested" on the date of injury, and any subsequent attempts to limit or restrict benefits should be held void. Plaintiffs claim the vested right is founded in statutory and common law. We shall conclude plaintiffs had no vested rights to continued physical therapy benefits, and the amended Plan is not unconscionable.

#### A. Statutes

Plaintiffs contend there was a vested right to continued coverage under Insurance Code section 10291.5, subdivision (b)(4),[3] which restricts insurers' ability to reduce benefits in *disability insurance* policies.

However, that statute on its face applies only to disability insurance policies subject to approval by the Insurance Commissioner.

At issue in this case is not an insurance policy subject to approval by the Insurance Commissioner, but a "health care service plan" subject to approval

---

[3]Insurance Code section 10291.5, subdivision (b), provides: "The commissioner [Insurance Commissioner per Insurance Code section 20] shall not approve any disability policy for insurance or delivery [*sic*] in this state in any of the following circumstances: [¶] . . . [¶] (4) If it contains provision or provisions which would have the effect, upon any termination of the policy, of reducing or ending the liability as the insurer would have, but for the termination, for loss of time resulting from accident occurring while the policy is in force or for loss of time commencing while the policy is in force and resulting from sickness contracted while the policy is in force . . . and also contains provision or provisions reserving to the insurer the right to cancel or refuse to renew the policy, unless it also contains other provision or provisions the effect of which is that termination of the policy as the result of the exercise by the insurer of any such right shall not reduce or end the liability in respect to the hereinafter specified losses as the insurer would have had under the policy, including its other limitations, conditions, reductions, and restrictions, had the policy not been so terminated. . . ."

by the Commissioner of Corporations under the Knox-Keene Act (Health & Saf. Code, § 1340 et seq.).[4] Plaintiffs do not dispute that Blue Shield is a health care service plan subject to the Knox-Keene Act (as indicated in the Plan itself). The stated purpose of the Knox-Keene Act is "to promote the delivery of health and medical care to the people of the State of California who enroll in, or subscribe for the services rendered by, a health care service plan or specialized health care service plan . . . ." (§ 1342.)

Health care service plans under the Knox-Keene Act are generally subject to the jurisdiction of the Commissioner of Corporations (§ 1341), *not* the Insurance Commissioner. Thus, Insurance Code section 740, subdivision (g),[5] exempts health care service plans from Department of Insurance jurisdiction (though the Commissioner of Corporations is to consult with the Insurance Commissioner to ensure consistency of regulations to the extent practicable under section 1342.5). Regulations concerning health care service plans are found in title 10 of the California Code of Regulations, section 1300.43 et seq.

Thus, the Plan at issue in this case was not subject to approval by the Insurance Commissioner, hence was not subject to Insurance Code section 10291.5.

Additionally, a health care service plan is not necessarily equivalent to an insurance company for regulatory purposes. The Insurance Code defines "insurance" as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (Ins. Code, § 22.) "Health care service plan" under the Knox-Keene Act means "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees. . . ." (§ 1345, subd. (f)(1).) One of the purposes of the Knox-Keene legislation is to "Help[] to assure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers [professionals or health facilities licensed to deliver or furnish health care services]." (§§ 1342, subd. (d), 1345, subd. (i).)

---

[4]Hereafter, undesignated statutory references are to the Health and Safety Code.

[5]Insurance Code section 740, subdivisions (c) and (d), provide that any entity unable to show it is subject to the jurisdiction of another agency shall submit to an examination by the Insurance Commissioner and shall meet the requirements of the Insurance Code. Subdivision (a) of the same statute states that any entity providing coverage for medical expenses shall be presumed to be subject to the jurisdiction of the Department of Insurance unless it shows it is subject to the jurisdiction of another agency. Subdivision (g) of the same statute provides, "A health care service plan, as defined in Chapter 2.2 (commencing with Section 1340) of Division 2 of the Heath and Safety Code, shall not be subject to this section."

Plaintiffs cite *Sarchett* v. *Blue Shield of California* (1987) 43 Cal.3d 1, 3, footnote 1 [233 Cal.Rptr. 76, 729 P.2d 267], for the asserted proposition that there is no distinction between insurance and health care service plans. However, *Sarchett* merely stated "Blue Shield notes that it is a health care service plan rather than an insurance company. Because the distinction is immaterial for purposes of our decision, we discuss the issues in terms of insurance." (*Id.* at p. 3, fn. 1.) *Sarchett* went on to hold the trial court erred in directing a verdict that Blue Shield had violated its duty of good faith and fair dealing by disagreeing with the judgment of a treating physician, but Blue Shield had violated the covenant by failing to inform the plaintiff about the right to impartial review and arbitration. Thus, *Sarchett* does not assist plaintiffs in this case.[6]

Plaintiffs assert title 10, section 2218.2, subdivision (b), of the California Code of Regulations grants authority to the Commissioner of Insurance to regulate "non-profit hospital service plans." However, plaintiffs fail to show that any "hospital" plan is at issue in this case.

Plaintiffs propose various reasons why Insurance Code section 10291.5 should be applied to health care service plans. None is persuasive.

Thus, plaintiffs contend Blue Shield is subject to the requirements of "certain" provisions of the Insurance Code. They assert Insurance Code section 10270.98 was enacted to regulate a health care service plan in terms of standard provisions applicable to disability policies. They cite *Kaiser Foundation Health Plan, Inc.* v. *Lifeguard, Inc.* (1983) 18 Cal.App.4th 1753, 1761, footnote 2 [23 Cal.Rptr.2d 235] (hereafter *Lifeguard*).) However, Insurance Code section 10270.98 governs coordination of benefits where an insured has more than one source of coverage. *Lifeguard* ruled the statutory language was ambiguous as to whether it applied to health care service plans. (*Lifeguard, supra,* at p. 1761.) After reviewing the legislative history, the court determined this statute applied to one type of health care service plan—group practice prepayment plans. (*Ibid.*)

Here, we are unaware of any legislative history of Insurance Code section 10291.5 supporting plaintiffs' contention that the statute should be applied to health care service plans.

In their reply brief, plaintiffs argue Blue Shield is indeed a "disability insurer," hence directly subject to Insurance Code section 10291.5, because Insurance Code section 106 assertedly defines disability insurance to include

---

[6]Plaintiffs argue Blue Shield is not similar to an "HMO." They do not explain how that helps their case.

sickness, accident and health insurance plans. While we could disregard this new argument presented for the first time in the reply brief (*Garcia* v. *McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10 [66 Cal.Rptr.2d 319, 940 P.2d 906]; *Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788]), we have elected to consider the contention and have given Blue Shield the opportunity to file a supplemental brief, which it did.

Insurance Code section 106 provides, "Disability insurance includes insurance appertaining to injury, disablement or death resulting to the insured from accidents, and appertaining to disablements resulting to the insured from sickness."

Plaintiffs focus on the statute's reference to "accidents" and "sickness," ignoring the references to "insurance." Plaintiffs cite nothing suggesting the Plan qualified as "insurance." Plaintiffs cite nothing to defeat the exemption of Insurance Code section 740, subdivision (g), which, as we have seen, exempts from the jurisdiction of the Insurance Commissioner health care service plans which are subject to the jurisdiction of the Commissioner of Corporations.

Plaintiffs argue that even if Insurance Code section 10291.5 does not apply, its terms provide the foundation for a parallel rule applicable to health care service plans. Plaintiffs appear to argue that since the Commissioner of Corporations is to consult with the Insurance Commissioner before adopting regulations "to ensure the consistency of regulations applicable to these plans" (see § 1342.5),[7] there is a basis for a parallel rule. However, this court does not legislate. Plaintiffs' remedy properly lies "on the other side of Tenth Street, in the halls of the Legislature." (*Osborn* v. *Hertz Corp.* (1988) 205 Cal.App.3d 703, 711 [252 Cal.Rptr. 613].)

Plaintiffs also cite section 1342, that "It is the intent and purpose of the Legislature to promote the delivery of health and medical care . . . by accomplishing all of the following: [¶] . . . [¶] (d) Helping to assure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers. [¶] . . . [¶] (g) Assuring that subscribers and enrollees receive available and accessible health and medical services rendered in a manner providing continuity of care." Plaintiffs argue that Blue Shield does not transfer any financial risk

---

[7]Section 1342.5 calls for the Commissioner of Corporations to consult with the Insurance Commissioner before adopting regulations applicable to health care service plans, "for the specific purpose of ensuring, to the extent practical, that there is consistency of regulations applicable to these plans and entities by the Insurance Commissioner and the Commissioner of Corporations."

away from them and does not assure "continuity of care" and therefore does not deserve to be called a "health care service plan." We disagree.

We conclude Insurance Code section 10291.5 does not apply. We therefore need not address Blue Shield's argument that even if the statute applied, it governs only termination of coverage, and this case involved not termination but a reduction in coverage.

We conclude there is no statutory basis for the "vested rights" claimed by plaintiffs.

B. *Common Law*

Plaintiffs contend common law supports their position concerning vested rights. We disagree.

Much of plaintiffs' argument turns on their asserted belief that the "insured" event in this case was the aircraft accident. Thus, they assert, for example, an auto insurer cannot escape liability by changing the policy after an automobile accident has occurred. They cite authority that an insurer cannot unilaterally avoid liability under a policy once the contingency insured against occurs. (*Golden Eagle Ins. Co.* v. *Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1389 [25 Cal.Rptr.2d 242].) However, we shall conclude that by the clear and conspicuous terms of the Plan at issue in this case, the "insured" events were the furnishing of medical services, not the accident itself.

■ Plaintiffs cite the following language from *Fields* v. *Blue Shield of California* (1985) 163 Cal.App.3d 570 [209 Cal.Rptr. 781] (hereafter *Fields*): " 'A valid cancellation or modification of a group policy . . . does not have the effect of releasing the insurer from liability which accrued prior thereto by reason of the happening of the contingency insured against. In other words, once liability has attached under a group policy—that is, after the happening of the event insured against—cancellation or modification of the master policy is ineffective to preclude recovery by the employee or his beneficiary as provided by the original policy, irrespective of whether the policy is contributory or noncontributory." (*Id.* at pp. 585-586, italics omitted.)

Contrary to plaintiffs' position, *Fields* did not establish a general rule in California that the Plan benefits vest upon the occurrence of the injury.

Thus, in *Fields*, a group health plan originally provided for a "lifetime maximum benefit" of $50,000 for treatment of mental illness. (*Fields, supra,*

163 Cal.App.3d at p. 576.) A subsequent modification of the Plan in 1976 excluded coverage for psychological treatment when it was used toward earning a degree. (*Id.* at p. 578.) The plaintiff was a physician who began psychotherapy for medical reasons in 1974, but who later decided to become a psychotherapist and continued receiving therapy as part of his training requirements. (*Id.* at p. 575.) Blue Shield continued paying for the psychotherapy until 1978, when it disallowed benefits in reliance on 1975 policy language as "clarified" in 1976. (*Id.* at p. 576.) The plaintiff brought suit. During trial, he moved for a directed verdict on the ground the new exclusion was inoperative as to him as a matter of law. The trial court refused to rule on the motion, and the jury returned a defense verdict for Blue Shield. (*Ibid.*) The appellate court reversed and directed entry of judgment for the plaintiff.

*Fields* held Blue Shield could not enforce the exclusion against the plaintiff. First, the court applied the California law of adhesion contracts, that " 'California courts have long been disinclined to effectuate clauses of limitation of liability which are unclear, unexpected, inconspicuous or unconscionable.' " (*Fields, supra,* 163 Cal.App.3d at p. 579, citing *Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 879 [27 Cal.Rptr. 172, 377 P.2d 284].) The *Fields* court said the limitation of coverage (for education-related psychotherapy) was placed, not in the limitation or exclusion section, but at the end of the benefit granting provisions. (*Fields, supra,* 163 Cal.App.3d at p. 579.) This was not a clear, conspicuous notice. (*Ibid.*) *Fields* also said that even if the contract was not an adhesion contract, the same result would apply, because of the rule construing ambiguities in insurance policies against the drafter, the insurer—a rule which applied to health insurance contracts, regardless of whether they were deemed adhesive. (*Id.* at p. 582.)

The *Fields* court determined the original Plan was ambiguous, and under conventional contract law, the ambiguity must be construed against the party who created the ambiguity. (*Fields, supra,* 163 Cal.App.3d at pp. 584-585, citing Civ. Code, § 1654.) The clause which was deemed ambiguous stated: " 'The contract may be modified or terminated. However, *no such modification or termination will effect adversely any benefit for a covered service rendered prior to such modification or termination.*' " (*Fields, supra,* 163 Cal.App.3d at p. 584.) This provision, said the *Fields* court, was ambiguous on its face and conflicted with the provision for " 'lifetime maximum Supplemental Benefits . . . [of] $50,000.00' " (*Ibid.*) *Fields* determined that the "lifetime maximum" language "evidence[d] a clear contractual intent of Blue Shield to provide for nervous or mental illness which might persist for the lifetime of an insured; once treatment was begun for a specific mental

illness Blue Shield was obligated to pay for it until a $50,000 lifetime maximum was reached. These benefits, up to $50,000 . . . became vested as a matter of legal and contractual right under the language of the 1975 plan." (*Id.* at p. 585.) Having concluded plaintiff had a vested right, *Fields* applied the rule that vested rights cannot be canceled or modified. (*Id.* at pp. 585-586.)

However, the facts of this case are distinguishable from *Fields* and more similar to *Fraker* v. *Sentry Life Ins. Co.* (1993) 19 Cal.App.4th 276 [23 Cal.Rptr.2d 372] (hereafter *Fraker*). In *Fraker*, the plaintiff, an independent building contractor, obtained group health insurance in 1978. (*Id.* at p. 279.) In 1983, while the Plan was in force, the plaintiff injured and subsequently lost his right eye. (*Id.* at p. 280.) At the time the injury occurred, the Plan provided for a "maximum" or "aggregate" benefit of $1 million. (*Id.* at p. 283.) For five years, the plaintiff received insurance benefits totaling nearly $50,000 for his medical expenses related to the eye injury. (*Id.* at p. 280.) In 1988, the underwriter, Sentry, gave notice that it would not be renewing the group plan and gave plaintiff the option of converting to an individual plan. (*Ibid.*) The plaintiff declined to exercise this option. The group plan was terminated. The plaintiff then sued Sentry, alleging among other things that his right to reimbursement for medical expenses under the plan was effective throughout his lifetime up to the maximum liability of $1 million. (*Id.* at p. 280.)

*Fraker* defined the question as "whether upon modification or termination of a health insurance policy the insurer may still be held liable for the insured's medical expenses for a particular illness or condition which was covered under the former policy." (*Fraker, supra*, 19 Cal.App.4th at p. 281.)

*Fraker* observed: "Other states' treatment of this issue of vesting of medical insurance coverage has depended principally on the precise wording of the policy in question rather than the particular manner in which the insurance coverage was eliminated. [Citation.] 'Thus, the insurer's liability for all expenses relating to a particular illness or condition has been held to have become fixed upon the inception of the illness or disease, where the policy in question *provided benefits for an illness contracted during the life of the contract.* . . . But where the policy *provided insurance against the insured's incurring expenses or charges as a result of a disease or condition having its inception during the policy term,* the termination of the policy has been held to mark the end of the insurer's liability thereunder.' [Citation.]" (*Fraker, supra*, 19 Cal.App.4th at p. 281, original italics.)

*Fraker* said: "We look first at *what event* was insured according to the language of the instant policy. If the relevant event was the inception of a

disease or condition by appellant during the life of the policy, this may give rise to respondent's posttermination liability. If appellant's incurrence of medical expenses during the policy period was the relevant event, then this creates only pretermination liability for respondent. [Citation.]" (*Fraker, supra,* 19 Cal.App.4th at p. 282, original italics.)

*Fraker* stated there was no language in the policy or certificate of insurance specifying or suggesting that it was the occurrence of a specific injury or illness that was the insured event. (*Fraker, supra,* 19 Cal.App.4th at p. 282.) "To the contrary, the documents unambiguously stated that the insured was entitled to medical benefits for covered charges incurred during the life of the policy, that benefits were payable for covered charges only during the term of the policy, and that no benefits were payable for covered charges incurred after termination of insurance coverage. . . ." (*Ibid.*) "Also pertinent to the issue of vesting is the presence of certain provisions in health insurance policies. For example, if the subject [Plan] expressly provides for termination of coverage, for no posttermination coverage, or for posttermination benefits under strictly limited conditions, no vesting of benefits has been found. (*Sonneman* v. *Blue Cross, Etc., of Minn.* (Minn.Ct.App. 1987) 403 N.W.2d 701; *Tabb* v. *Louisiana Health Services & Indem. Co.* (La.Ct.App. 1977) 352 So.2d 771.)" (*Fraker, supra,* 19 Cal.App.4th at p. 282.)

*Fraker* pointed out that *Sonneman* v. *Blue Cross, etc., of Minn.* (Minn. Ct. App. 1987) 403 N.W.2d 701, specifically referred to the only California case applying the "vesting" concept to a health insurance policy: *Fields, supra,* 163 Cal.App.3d 570. (*Fraker, supra,* 19 Cal.App.4th at p. 282.)

*Fraker* described and distinguished *Fields* in the following analysis, with which we agree:

"In *Fields,* the original group health policy provided for a 'lifetime maximum benefit' for treatment of mental illness of $50,000. A subsequent modification of the [Plan] excluded coverage for psychological treatment when it was used toward earning a degree. The plaintiff was a physician who began psychotherapy for medical reasons, but who later decided to become a psychotherapist and continued receiving therapy as part of his training requirements. When payment for this treatment ceased, he brought suit to recover damages.

"The *Fields* court found, not only that the policy's language relating to benefits was ambiguous, but that the defendant insurer continued to pay for mental health benefits two years after the modification disallowed such

benefits. The appellate court thus interpreted 'lifetime maximum benefit' in favor of the insured plaintiff, holding that his interpretation of the lifetime $50,000 maximum amount was supported by the insurer's own acts in interpreting the policy. [Citation.] The *Fields* court further held that, although the policy was a medical insurance contract, it was appropriate to construe its provisions in the same manner as an accident insurance policy; that is, the insured's right to benefits under the contract became vested when medical treatment became necessary, and this 'vesting' was not eliminated by the subsequent termination of the policy. [Citation.]

"*Sonneman*, in contrast to *Fields*, analyzed the term 'lifetime' coverage in its policy as *not* creating maximum lifetime coverage in the total amount specified, but as the maximum benefit allowed *if* the insured was insured under the policy throughout his lifetime. [Citation.] The *Sonneman* court found that a contrary reading would render meaningless the unambiguous policy provisions in that case which (1) provided for the termination of coverage, and (2) extended benefits beyond termination of the policy only to insureds who were disabled. [Citation.]" (*Fraker, supra*, 19 Cal.App.4th at pp. 282-283, italics in original.)

*Fraker* rejected the plaintiff's argument that *Fields* established a general rule of vesting pertaining to health insurance policies regardless of policy language. (*Fraker, supra*, 19 Cal.App.4th at p. 283.) *Fraker* determined the policy before it was similar to the policy in *Sonneman*, not *Fields*. "Moreover, unlike *Fields or Sonneman*, here, significantly, neither the master group policy nor the certificate of insurance described the maximum reimbursement amount for medical expenses as a 'lifetime' sum. Instead, the documents simply described the amount of $1 million as an 'aggregate' or 'maximum' benefit." (*Fraker, supra*, 19 Cal.App.4th at p. 283, italics in original.)

*Fraker* concluded "under the present circumstances the only 'lifetime' benefits available to appellant were those for covered charges incurred during the *lifetime* of his policy. This is so in light of the policy's numerous unambiguous provisions which anticipated the termination of insurance coverage. These provisions expressly provided for the termination of the policy, for the extension of benefits after termination only to totally disabled insureds (appellant concedes he is not totally disabled), and for the availability of conversion of coverage upon termination. Such provisions would be rendered meaningless if the instant policy was interpreted as creating 'lifetime' benefits for appellant regardless of the termination of his insurance coverage. [Citation.]" (*Fraker, supra*, 19 Cal.App.4th at p. 284, italics in original.)

We agree with *Fraker* and conclude it applies in this case. Here, the Plan clearly and conspicuously told plaintiffs: "No person has the right to

receive the benefits of this plan for Services furnished following termination of coverage. *Benefits of this plan are available only for Services furnished during the term it is in effect* and while the individual claiming benefits is actually covered by this Agreement. Benefits may be modified during the term of this plan as specifically provided under the terms of this Agreement or upon renewal. *If benefits are modified, the revised benefits (including any reduction in benefits or the elimination of benefits) apply for Services furnished on or after the effective date of the modification. There is no vested right to receive the benefits of this Agreement.*" (Italics added.) Moreover, the Plan contained no promise of "lifetime" benefits which would create an ambiguity. Rather, the Plan merely provided for a maximum aggregate (fn. 1, *ante*).

Plaintiffs argue the Plan conferred a "lifetime" benefit, though not stated in so many words, because the provision concerning "maximum aggregate payment" stated, "The maximum aggregate payment amount is determined by aggregating all Blue Shield benefits provided for or on behalf of any Person . . . pursuant to this Agreement, *or any prior or subsequent Agreement* between the Subscriber and Blue Shield." (Italics added.) However, in context this provision merely meant that benefits were to be provided only while there was insurance coverage. In *Fraker*, the plaintiff sought to rely on a sales brochure which specified the maximum was " *'payable for the lifetime of the insured.'* " (*Fraker, supra*, 19 Cal.App.4th at p. 283, italics in original.) In addition to finding the reliance misplaced because of the brochure's disclaimer that it was for information only and not a substitute for the Plan, *Fraker* stated: "Also, the aforementioned 'lifetime' statement was qualified by the brochure itself which stated, 'provided [the insured] remains insured in the plan.' This language is reasonably interpreted as meaning that 'lifetime' benefits were provided only while there was insurance coverage." (*Id.* at pp. 283-284.)

Plaintiffs argue the Plan language was ambiguous in other respects. Under the heading that the Plan was ambiguous, plaintiffs present a subheading labeled "The Reasonable Expectations Doctrine." Plaintiffs cite Kent Williams's declaration that he expected the Plan would cover any injury which occurred while the contract was in force, and that the actual Plan was not delivered until after his wife's accident. ■ Plaintiffs argue this declaration—particularly concerning the delayed delivery—creates a triable issue of material fact as to whether plaintiffs' expectations were objectively reasonable under the principle that "where a policy has not yet been issued, all standard exclusions to the insurance coverage, which the insured would not reasonably expect, must be called clearly and plainly to the attention of the insured if the insurer is to be permitted to rely on these exclusions to avoid payment of benefits under the policy." (*Logan* v. *John Hancock Mut. Life Ins. Co.* (1974) 41 Cal.App.3d 988, 996 [116 Cal.Rptr. 528].)

■ However, although plaintiffs raised this point in their memorandum of points and authorities in opposition to summary judgment, they did not submit it in any separate statement of disputed facts. Blue Shield's reply papers in the trial court pointed out that the trial court could decline to consider alleged facts not included in a separate statement of material facts. (*North Coast Business Park* v. *Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 31 [21 Cal.Rptr.2d 104].) The trial court's written ruling on the summary judgment motion did not address plaintiffs' point concerning alleged delayed delivery of the Plan. It thus appears the trial court did not consider this factual allegation. On appeal, plaintiffs do not acknowledge the deficiency in their presentation, nor do they present any argument or analysis to excuse it.

Moreover, although not raised by Blue Shield, we note that while the complaint alleged Blue Shield failed "to fulfill the reasonable expectations of WILLIAMS," there was no factual allegation in the complaint about delayed delivery of the Plan. Instead, the complaint alleged "On or before March 1, 1991, WILLIAMS applied for medical insurance and were [*sic*] issued Plan No. 954086-0000 . . . ." ■ It is the complaint which measures the scope of issues material to a summary judgment proceeding. (*FPI Development, Inc.* v. *Nakashima* (1991) 231 Cal.App.3d 367, 381 [282 Cal.Rptr. 508].)

■ Although not mentioned by the parties, we note the transcript of the hearing on the summary judgment motion reflects a discussion concerning whether plaintiffs were required to present a separate statement of facts concerning Blue Shield's alleged delays in handling plaintiffs' claims for physical therapy benefits (a matter not at issue on appeal). We note this was a different issue, because the complaint alleged that Blue Shield delayed processing plaintiffs' claims. Since it was alleged in the complaint, it was Blue Shield's burden as the party moving for summary judgment to meet this allegation. In contrast, the complaint contained no allegation concerning delayed delivery of the Plan.

We therefore conclude we have no need to consider the matter of when plaintiffs received the Plan. ■ Insofar as plaintiffs argue reasonable expectations apart from the asserted delay in delivery of the Plan, the argument fails, because where contractual language is clear and unequivocal, the subscriber may only reasonably expect the coverage afforded by the plain language of the contract. (*Consolidated, Inc.* v. *Northbrook Ins. Co.* (1979) 92 Cal.App.3d 888, 892 [155 Cal.Rptr. 172].)

■ Plaintiffs contend the Plan's language is labored and confusing, filled with technical terms that are difficult for an ordinary layperson to understand. We disagree.

Plaintiffs claim they were unfamiliar with the term "vested right" as used in the Plan: "There is no vested right to receive the benefits of this Agreement." However, the cited declaration of Kent Williams does not directly attest unfamiliarity with the term but rather professes an expectation of entitlement of $2 million in benefits. ■ Moreover, it is a general rule a party is bound by contract provisions and cannot complain of unfamiliarity of the language of a contract. (*Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 [131 Cal.Rptr. 882, 552 P.2d 1178].) This duty to read the contract is insufficient to bind a party to unusual or unfair language unless it is brought to the attention of the party and explained. (*Fields, supra,* 163 Cal.App.3d at p. 578.) A technical term is ambiguous if it would not reasonably be known to a layperson of ordinary intelligence. (*Ponder* v. *Blue Cross of Southern California* (1983) 145 Cal.App.3d 709 [193 Cal.Rptr. 632].)

■ Here, even assuming for the sake of argument that the term "vested right" is unusual or unfair language (a dubious proposition), the Plan clearly stated, immediately before the sentence saying there is no vested right to benefits, that any revisions would apply to services furnished on or after the effective date of modification. Thus, plaintiffs' claim that they did not understand the term "vested right" is unavailing.

Plaintiffs argue the contract defines terms such as "accidental injury," "disability," and "total disability" that are not "cogently utilized" in the balance of the text, suggesting that the agreement covers "injuries" that occur while the Plan is in force along with the ensuing expenses. We do not find this point helpful to plaintiffs' position.

Plaintiffs assert the Plan contains other ambiguities, e.g., the definition of "physical therapy" was inapplicable to plaintiff. This does not help plaintiffs' case.

Plaintiffs argue the very fact that Blue Shield increased one benefit (the maximum aggregate) while decreasing another (physical therapy) created an ambiguity. Plaintiffs argue an ambiguity is created in that, because of the reduction in one benefit, one could never possibly reach the new maximum aggregate. We disagree. The maximum aggregate covers much more than physical therapy.

Plaintiffs argue the placement of the "IMPORTANT!" advisement at the very front of the Plan, before the Introduction, appeared ambiguous. We disagree. Plaintiffs argue the advisement was deceptive, because the first sentence ("No person has the right to receive the benefits of this plan for Services

furnished following termination of coverage") spoke about terminated coverage, such that persons whose coverage had not terminated would likely and reasonably pay little attention to the rest of the advisement, since their coverage had not terminated. We disagree that this created an ambiguity assisting plaintiffs' case.

Plaintiffs argue: "If Blue Shield has the unfettered right to increase and decrease benefits and aggregate limits every three months, what would happen if the aggregate limit were increased to $10 million and then three months later decreased to $50,000? Would any of the increases/decreases be applicable in light of the fact that they are 'subsequent agreements?' " Plaintiffs also argue Blue Shield's approach would permit it to transfer all its healthy insureds to a "new" plan and dramatically limit the benefits owed to the catastrophically injured and chronically ill. However, plaintiffs forget that revisions must be approved by the Department of Corporations. Thus, plaintiffs' points are without merit.

Plaintiffs argue *Fraker* is distinguishable because it involved a group plan, whereas here we deal with an individual plan. However, nothing in *Fraker* makes this distinction material. Although it has been said that bargaining is more likely to occur with a group plan (*Madden* v. *Kaiser Foundation Hospitals, supra,* 17 Cal.3d at p. 710), and courts have been disinclined to effectuate "unclear, unexpected, inconspicuous or unconscionable" clauses in standardized contracts between parties of unequal bargaining strength (*Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d at p. 879), here the clause was very clear, conspicuous and, as we discuss *post,* not unconscionable.

Plaintiffs argue that *Fraker* is distinguishable because there the plaintiff had been presented with an option to convert to another plan, but he chose not to accept it. However, that was not the basis for the *Fraker* decision.

Plaintiffs cite cases from other jurisdictions which found vested rights in health care coverage. (*Lutsky* v. *Blue Cross Hosp. Service, Inc., of Missouri* (Mo. 1985) 695 S.W.2d 870; *Myers* v. *Kitsap Physicians Service* (1970) 78 Wn.2d 286 [474 P.2d 109, 66 A.L.R.3d 1196].) However, those decisions were based on determinations that the contracts were ambiguous. Thus, *Myers* stated the provision that the health plan " 'agrees to provide medical . . . services to each member . . . during the life of this contract' " was susceptible of an interpretation that the "life of the contract" was automatically extended to such time as may be required to treat and care for injury or illness that occurred during the year of the contract. (*Myers* v. *Kitsap Physicians Service, supra,* 474 P.2d at p. 111.) While we may disagree with

*Myers* on this point, it is unnecessary to do so, since our case is distinguishable on its facts, in that here the Plan clearly advised that the insured event was the furnishing of services. In *Lutsky*, the Missouri court found an ambiguity was created where a policy contained a promise of a "lifetime" maximum, which was taken away in another part of the agreement which allowed Blue Cross to change the program. (*Lutsky* v. *Blue Cross Hosp. Service, Inc., of Missouri, supra,* 695 S.W.2d at pp. 873-875.) As we have noted, there was no lifetime promise in the case before us.

We conclude plaintiffs fail to show any common law basis for their claim of vested rights.

## C. *The Plan Is Not Unconscionable*

Plaintiffs argue we should find unconscionable Blue Shield's right to reduce benefits. We disagree.

Civil Code section 1670.5 provides:

"(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."

"As embodied in Civil Code section 1670.5, subdivision (a), the concept of 'unconscionability has both a "procedural" and a "substantive" element.' [Citation.] 'The former includes (1) "oppression," which refers to an inequality of bargaining power resulting in no real negotiation and the absence of meaningful choice; and (2) "surprise," which occurs when "the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." . . . [¶] "Substantive" unconscionability consists of an allocation of risks or costs which is overly harsh or one-sided and is not justified by the circumstances in which the contract was made. [Citation.] Presumably both procedural and substantive unconscionability must be present before a contract will be held unenforceable. However, a relatively larger degree of one will compensate for a relatively smaller degree of the other.' [Citation.]" (*Samura* v. *Kaiser*

*Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1296-1297 [22 Cal.Rptr.2d 20].)

■ We first note a defendant who relies on contract terms in moving for summary judgment need not establish the contract is *not* unconscionable, unless the plaintiff's complaint alleged facts suggesting unconscionability. (*Westlye* v. *Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1738-1740 [22 Cal.Rptr.2d 781].) ■ Here, the complaint alleged Blue Shield's interpretation of its own contract would violate public policy, but the complaint contained no factual allegations of unconscionability. Thus, plaintiffs in opposing summary judgment had the burden to show unconscionability. (*Ibid.*)

We agree with Blue Shield that, although Blue Shield drafted the Plan and its amendments, some procedural protections are provided in that the Plan and amendments were subject to a review and approval process by the Department of Corporations (DOC), as required under section 1352.1. The Legislature has thus provided some procedural protections to consumers, though we do not rely solely on DOC approval for our conclusion that the Plan was not unconscionable.[8] The Plan clearly and conspicuously allowed for the type of reduction which took place in this case. Moreover, the Plan and amendments are not overly harsh or one-sided. While one type of benefit was decreased, there was a substantial increase in the maximum aggregate coverage. Plaintiff insists the increase is illusory and meaningless to her, because of the new limitation on physical therapy. However, the maximum is not meaningless to plaintiff, because it provides her with increased coverage for the other types of medical benefits conferred by the Plan.

As Blue Shield notes, a principal purpose of health care service plans is to provide accessible and affordable health care services. (§ 1342.) The Legislature has allowed health care service plans to retain the right to modify contracts. Requiring health care service plans to provide vested lifelong coverage would obviously cause the cost of coverage to increase.

Plaintiffs argue "Blue Shield deprived a severely injured insured of critically needed physical therapy, essentially the major ingredient for her survival, and the only hope for recovery." They cite no evidence, but even assuming plaintiff's need for physical therapy, that need does not render the Plan unconscionable.

Plaintiffs insinuate they had no opportunity to negotiate the terms of the Plan and no chance to bargain. However, the Plan on its face stated the

---

[8]Blue Shield argues the DOC's decision is entitled to deference. Plaintiffs disagree. We need not resolve the dispute, since we are not relying on DOC's approval of these amendments as establishing their validity.

benefits of this plan, which was designed to reduce the subscriber's health care costs, "DIFFER[ED] SUBSTANTIALLY FROM TRADITIONAL BLUE SHIELD PLANS." Thus, on its face the Plan suggests the availability of other plans. As noted by the trial court, nothing in the record indicates that plaintiffs had no choice but to accept the plan they chose.

Plaintiffs argue Blue Shield is better positioned actuarially to determine the appropriate premiums to fund the vested rights of its subscribers, perhaps by acquiring reinsurance. This argument does not persuade us to hold the Plan amendment unconscionable.

Plaintiffs argue unconscionability is made clear by comparison with other types of insurance arrangements, i.e., an auto insurer cannot decide to reduce benefits after an automobile accident, and a life insurance company cannot reduce benefits after the insured dies. However, we have explained that the covered event in this case was not the aircraft accident but rather the provision of medical services. Thus, plaintiffs' point is without merit.

In their reply brief, plaintiffs raised new points for the first time, with no excuse for failure to raise them earlier. Although we may disregard points raised for the first time in a reply brief (*Neighbours* v. *Buzz Oates Enerprises, supra,* 217 Cal.App.3d at p. 335, fn. 8), we asked Blue Shield to respond to these new points in a supplemental brief, and we shall consider them.

First, plaintiffs' reply brief cites an administrative regulation governing health care service plans, which provides that contracts, endorsements and amendments must include: "Appropriate captions, in boldface type, for the following provisions: limitations, exclusions, exceptions, reductions, deductibles, copayments and other provisions which may decrease or limit benefits to, or increase costs of, any subscriber or enrollee; [¶] (A) A benefit afforded by the contract shall not be subject to any limitation, exclusion, exception, reduction, deductible, or copayment which renders the benefit illusory." (Cal. Code Regs., tit. 10, § 1300.67.4, subd. (a)(3)(A).)

Plaintiffs contend this regulation invalidates the $1,000 per year restriction on physical therapy, because the restriction renders illusory the previous benefit, which was limited only by the $2 million maximum aggregate.

We disagree. The $1,000 limit does not render the physical therapy benefit illusory. Moreover, section 1367, subdivision (i), provides in part: "The

commissioner [of Corporations] shall by rule define the scope of each basic health care service which health care service plans shall be required to provide as a minimum for licensure under this chapter. Nothing in this chapter shall prohibit a health care service plan from charging subscribers or enrollees a copayment or a deductible for a basic health care service or from setting forth, by contract, limitations on maximum coverage of basic health care services, provided that the copayments, deductibles, or limitations are reported to, and held unobjectionable by, the commissioner and set forth to the subscriber or enrollee pursuant to the disclosure provisions of Section 1363." Here, it is undisputed the amendment was reported to and held unobjectionable by the Commission of Corporations.

Thus, we reject plaintiffs' argument concerning administrative regulation title 10, section 1300.67.4 of the California Code of Regulations.

In their reply brief, plaintiffs also contend the $1,000 limit on physical therapy benefits violates sections 1367, subdivision (g),[9] and 1342, subdivision (a),[10] which call for medical decisions to be made by doctors. Plaintiffs claim: "By unilaterally determining that physical therapy benefits be limited to $1000 per year, BLUE SHIELD, through its amendment, has as a practical matter taken the role of the physician in deciding that a catastrophically spine-injured claimant receive an extremely limited physical therapy benefit." However, under plaintiffs' reasoning, no limits would ever be allowed, in contravention of section 1367, subdivision (i), which expressly allows such limitations in its provision that "Nothing in this chapter shall prohibit a health care service plan . . . from setting forth, by contract, limitations on maximum coverage of basic health care services, provided that the copayments, deductibles, or limitations are reported to, and held unobjectionable by, the commissioner and set forth to the subscriber or enrollee . . . ."

Plainly, the provisions cited by plaintiffs relate to the qualitative manner in which physicians and other medical professionals exercise medical judgment. They do not allow doctors to dictate the amount of coverage.

We conclude the trial court properly granted summary judgment.

---

[9] Section 1367, subdivision (g), provides in part: ". . . The plan shall be able to demonstrate to the department that medical decisions are rendered by qualified medical providers, unhindered by fiscal and administrative management."

[10] Section 1342, subdivision (a), states the intent of the Legislature to "[a]ssur[e] the continued role of the professional as the determiner of the patient's health needs . . . ."

## DISPOSITION

The judgment is affirmed. Blue Shield shall recover its costs on appeal.

Morrison, J., and Kolkey, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 25, 1999. Mosk, J., was of the opinion that the petition should be granted.