[No. A075737. First Dist., Div. Four. Aug. 22, 1997.]

JAMES R. McGETTIGAN, Plaintiff and Appellant, v.
BAY AREA RAPID TRANSIT DISTRICT, Defendant and Respondent.

**COUNSEL**

Richard W. Meier for Plaintiff and Appellant.

Michel & Manning, Peter Johnson and Jeff M. Fackler for Defendant and Respondent.

OPINION

**HANLON, J.**—Appellant James R. McGettigan appeals from a judgment of dismissal in favor of respondent San Francisco Bay Area Rapid Transit District (BART) after respondent's demurrer to appellant's complaint was sustained without leave to amend. We affirm the judgment of dismissal.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Appellant seeks damages for injuries he sustained at the Richmond BART station on September 18, 1995. His March 16, 1996, complaint alleges three causes of action. In a first cause of action for general negligence, appellant alleges that he was asleep on a Richmond-bound BART train. When the train reached the end of the line, he was awakened by a train operator who ordered him to leave. Although he was "obviously unable to care for his own safety," respondent's employees "negligently moved the train and otherwise failed to protect [him]." After the train left the station, appellant was found lying on platform 1 with his legs sticking out into the trackway. He sustained lacerations on his chin, a laceration and compound fracture to his right ankle, and a laceration on his right eye. Appellant alleges that respondent's employees "attempt[ed] to cover up" their negligence in connection with his accident. In a second cause of action for breach of contract, appellant alleges that the ticket he purchased from respondent in Fremont constituted an agreement by respondent to provide him safe passage and to exercise the "utmost duty of care" to insure his safety. In a third cause of action for premises liability, appellant alleges he was left standing on the Richmond platform while respondent's employees moved the train, and otherwise repeats the allegations of the negligence count.

On April 16, 1996, respondent demurred generally to all three causes of action on the ground that appellant failed to allege facts sufficient to state a cause of action and demurred specifically to the third cause of action on the ground that it was uncertain. Respondent's demurrer was sustained without leave to amend on June 6, 1996, and respondent served notice of entry of the order sustaining the demurrer on June 7, 1996.

On July 3, 1996, appellant filed a motion for reconsideration pursuant to Code of Civil Procedure section 1008, subdivision (a). In his moving papers, appellant alleges the following new facts. He is a 56-year-old retiree who was having a "difficult 24 hours in the area of domestic relations" on the day of the accident. "Perhaps due to these difficulties," he was dropped off at the Fremont BART station. He intended to return home to Walnut Creek, but missed his connecting train. At the end of the Richmond line a train operator

ordered him to leave and told him he could catch a Fremont train on the other side of the tracks. The train operator then "reminded him to take his brown paper bag which contained a bottle of vodka, and noticed that it spilled onto his pants when he picked it up." Although appellant was obviously inebriated, he was left standing on the edge of the platform at the station. Appellant submits that "BART should have done more in the way of precautionary measures than leaving a drunk teetering on the edge of [the] platform with its precipitous fall, and still within harm's way of a departing train."

Later, a station agent went to the platform after a patron indicated that a man "was on the trackway." Appellant was found "lying face down, with his legs hanging over the edge of the platform, his shoes were on the platform about 30 feet from each other, and he was bleeding from the face and right leg, his ankle was almost severed." He was taken to John Muir hospital for treatment where his blood-alcohol level was .37 percent when tested at 1:00 p.m.[1] Appellant admits that he cannot recall how he was injured, and advises that there were no witnesses to the accident. Appellant believes he may have been struck by a train because "the facts and physical evidence clearly point[]" to that conclusion. On appeal, he speculates that he may have been "struck by the train as it departed, or simply fell off the edge of the platform."

Appellant attached a first amended complaint to his motion for reconsideration. The amended complaint added no new allegations other than references to a "zone of danger."[2] It alleges that respondent was negligent in ordering him off the train into a "zone of danger" and in moving the train before he was out of the "zone of danger."

A judgment dismissing the complaint was entered on July 15, 1996. The reconsideration motion was denied on August 14, 1996, on the ground that it was not timely filed.[3] On August 19, 1996, appellant filed a motion under Code of Civil Procedure section 473 to set aside the judgment on the ground

---

[1]This level of blood alcohol has been described as a "near-lethal dose." (Gibeaut, *Sobering Thoughts* (May 1997) 83 A.B.A. J. 56, 58.)

[2]Appellant cites no authority for the "zone of danger" concept, and apart from the unusual situation addressed in *Palsgraf* v. *Long Island R. Co.* (1928) 248 N.Y. 339, 347, 349, 350 [162 N.E. 99, 101-103, 59 A.L.R. 1253] (dis. opn. of Andrews, J.), we are aware of no such characterization applied to a train station platform. (Cf. *Simmons* v. *Pacific Electric Ry. Co.* (1922) 60 Cal.App. 140, 143 [212 P. 641] [streetcar trackway described as "zone of danger"]; *Martz* v. *Pacific Electric Ry. Co.* (1916) 31 Cal.App. 592, 596 [161 P. 16] [railroad crossing].)

[3]The motion for reconsideration was untimely because it was filed more than 10 days after service of notice of entry of the order sustaining the demurrer (Code Civ. Proc., § 1008, subd. (a)), and appellant does not contend that the court erred in denying the motion. Thus none of the allegations advanced for the first time in connection with this motion are properly before

of attorney inadvertence, mistake, and excusable neglect. That motion was denied on September 10, 1996, and this appeal from the judgment followed.

## II. Discussion

### A. *Introduction*

██ On appeal from the sustaining of a demurrer without leave to amend, we accept the facts stated in the complaint as true but review the complaint de novo to determine whether the facts as pleaded state a cause of action. (*Medina* v. *Hillshore Partners* (1995) 40 Cal.App.4th 477, 481 [46 Cal.Rptr.2d 871].) We also accept as true all facts that may be inferred from those expressly alleged. (*Marshall* v. *Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339].) ██ Accordingly, we must accept for purposes of this appeal that: appellant was inebriated to the point of incapacity before his accident; respondent was aware of his condition; respondent ordered him onto the train platform and left him standing there; and he injured himself by falling off the platform or getting in the way of a moving train.

Appellant has now abandoned his breach of contract and premises liability claims,[4] and his sole theory of liability is one of negligence. Although the complaint includes allegations of negligent movement of a train, appellant acknowledges that he does not know whether he was hit by a train. Appellant's argument is that he should not have been left on the train platform where, in his inebriated state, he was apt to injure himself. Appellant submits that respondent's employees were negligent when, with knowledge of his "special needs," they "ordered him into a perilous situation and then abandoned him."

██ A tort, whether intentional or negligent, involves a legal duty, whether by statute, contract, or otherwise. Without such a duty, "any injury is '*damnum absque injuria*'—an injury without a wrong." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 6, p. 61, italics added.) The existence of a duty "is entirely a question of law . . . and it must be determined only by the court." (Prosser & Keeton, Torts (5th ed. 1984) § 37, p. 236.) "The 'legal duty' of care may be of two general types: (a) the duty of a person to use ordinary care in activities from which harm might reasonably be anticipated[, or] (b) [a]n affirmative duty where the person

---

us. However, we will consider all of appellant's allegations to dispose of any claim that he should be granted leave to amend his complaint.

[4]We deem these claims abandoned for lack of argument that the trial court erred in dismissing them. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1996) ¶ 9:21 rev. #1, 1996.)

occupies a particular relationship to others. . . . In the first situation, he is not liable unless he is actively careless; in the second, he may be liable for failure to act affirmatively to prevent harm." (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 732, p. 61.) There is no affirmative duty to render assistance unless the defendant stands in a special relationship to the plaintiff or has put the plaintiff in a position of peril. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137]; *Clarke* v. *Hoek* (1985) 174 Cal.App.3d 208, 215 [219 Cal.Rptr. 845]; see generally, Rest.2d Torts, § 314; 6 Witkin, *supra*, § 858, p. 220.) ■ Accordingly, respondent is not liable for failure to remove appellant from the train platform unless the parties were in a special relationship at the time of this failure, or respondent could be deemed to have created a situation of peril.

## B. *Affirmative Duty Triggered by a Special Relationship*

■ The special relationship of common carrier and passenger gives rise to the highest duty of care. While a carrier is not an insurer of its passenger's safety (*Gray* v. *City & County of San Francisco* (1962) 202 Cal.App.2d 319, 323 [20 Cal.Rptr. 894]; *Troutman* v. *Los Angeles Transit Lines* (1947) 82 Cal.App.2d 183, 185 [185 P.2d 616]), a carrier is required by statute "[to] use the utmost care and diligence for safe carriage, [to] provide everything necessary for that purpose, and [to] exercise to that end a reasonable degree of skill" (Civ. Code, § 2100). This statutory duty is one "of utmost care and the vigilance of a very cautious person." (*Orr* v. *Pacific Southwest Airlines* (1989) 208 Cal.App.3d 1467, 1472 [257 Cal.Rptr. 18].) Likewise, at common law, a "common carrier is under a duty to its passengers to take reasonable action [¶] (a) to protect them against unreasonable risk of physical harm, and [¶] (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others." (Rest.2d Torts, § 314A, p. 118.)

However, this heightened degree of care is owed only while "passengers are *in transitu*, and until they have safely departed the carrier's vehicle." (*Marshall* v. *United Airlines* (1973) 35 Cal.App.3d 84, 86 [110 Cal.Rptr. 416].) As explained in *Falls* v. *San Francisco etc. R.R. Co.* (1893) 97 Cal. 114, 119 [31 P. 901], " '[t]he passenger while in actual progress upon his journey is exposed to countless hazards, gives himself wholly in charge of the carrier. . . . But a rule properly ceases with the reason for it; therefore, as a passenger's entrance to the carrier's station is characterized by none of the hazards incident to the journey itself, the rigor of the rule above announced is justly relaxed, in that at such a time and place the carrier is bound to exercise only a reasonable degree of care for the protection of his passengers.' [Citation.] 'The rule in such cases is, that the carrier is bound

simply to exercise ordinary care, in view of the dangers to be apprehended.' [Citation.]" (*Id.* at pp. 119-120.) The carrier's affirmative duty of assistance applies only where the special relationship exists between the parties *and the risk of harm arises in the course of that relation.* (Rest.2d Torts, § 314A, com. c, p. 119.)

 Appellant alleges that he was ordered off the train and left standing on the platform. Under the circumstances, he could not be left on the train. It was the end of the line. He was ordered to leave and did so. Once he had safely exited the train, the relationship of carrier and passenger terminated. He was in a place of relative safety. (See *Riggins* v. *Pacific Greyhound Lines* (1962) 203 Cal.App.2d 125, 128 [21 Cal.Rptr. 336].) Thus, appellant cannot establish that respondent had a duty to assist him based on the existence of a special relationship.

Appellant contends, under the reasoning of *Marshall* v. *United Airlines*, *supra*, 35 Cal.App.3d 84, a case decided by Division One of this district, that his special relationship with respondent continued after he left the train because he remained in a hazardous "sphere of activity" associated with the journey while he was on the train platform. The plaintiff in *Marshall* was injured while walking in an airport terminal between flights. One of the issues before the court was whether the carrier owed a heightened duty of care to the plaintiff at the time of the accident. (*Id.* at p. 87.) The *Marshall* court found that the duty of care owed to the plaintiff was "no greater than that of ordinary or reasonable care" because the plaintiff had reached a place outside the " ' "sphere of any activity of the carrier which might reasonably constitute a mobile or animated hazard to the passenger." ' " (*Ibid.*) The court indicated that the higher standard of care would have applied if the accident had occurred in the landing area outside the terminal because "[t]he moving vehicles and the jet and propeller air blasts of an airline's landing area rather clearly present a 'mobile or animated hazard' to an arriving or departing passenger." (*Ibid.*)

Appellant's reliance on *Marshall* is misplaced because there are no mobile hazards on a train platform similar to those of an airline landing area. A train is on a fixed track, and there are no freely moving vehicles that might strike a passenger on the train's platform. Accordingly, we conclude that appellant was not within a "sphere of activity" as envisioned by the *Marshall* court.

Appellant further contends that the carrier-passenger relationship did not terminate because he was either (1) a passenger on the first leg of his trip, (2) a passenger who had begun the second leg, or (3) a passenger during the entire journey which included the transfer between the Richmond and Fremont trains. He cites *Squaw Valley Ski Corp.* v. *Superior Court* (1992) 2

Cal.App.4th 1499, 1510 [3 Cal.Rptr.2d 897], in support of his contention that, even though he had exited the train, he was waiting to board another and thus still a passenger. *Squaw Valley* held a ski resort liable for injuries sustained when a skier was injured as she attempted to board its ski lift, applying the principle that a carrier-passenger relationship may be established before the patron enters the carrier's vehicle. However, the court recognized that for this to occur, the carrier must take some action indicating acceptance of the passenger as a traveler. (*Id.* at p. 1510; accord, *Lagomarsino* v. *Market Street Ry. Co.* (1945) 69 Cal.App.2d 388, 395 [158 P.2d 982]; *Sanchez* v. *Pacific Auto Stages* (1931) 116 Cal.App. 392, 396 [2 P.2d 845].) The *Squaw Valley* court found a carrier-passenger relationship was established at the time of the accident because the carrier had manifested acceptance of the plaintiff as a passenger on the ski lift. (*Squaw Valley, supra*, 2 Cal.App.4th at p. 1510.) Here, appellant alleges no such facts. Appellant was not attempting to board respondent's train. Merely advising a passenger that he or she can catch a return train on another platform does not manifest acceptance of the passenger as a traveler.

Appellant further contends that respondent, as a common carrier, should have assumed responsibility for his care as a passenger because he was obviously incapacitated and unable to care for himself. Appellant cites *McBride* v. *Atchison, Topeka & S.F. Ry. Co.* (1955) 44 Cal.2d 113, 119 [279 P.2d 966], which held that a common carrier must render the necessary assistance to a person with special needs, such that " '[w]here a passenger is blind, sick, aged, very young, crippled, or infirm, and his condition is apparent or made known to the carrier, it is bound to render him the necessary assistance in *boarding or alighting* from its trains or cars.' [Citation.]" (*Id.* at p. 119, italics added and omitted.) Appellant contends that because the train operator observed his vodka bottle in the brown paper bag and the act of spilling vodka on his leg, it was apparent that appellant had special needs within the meaning of *McBride*.

However, *McBride* is distinguishable because appellant was not injured as he exited the train. In *McBride*, the plaintiff was on crutches. He was *disembarking* a railroad car and *proceeding down its steps* when one crutch came in contact with a wet cigar butt on the steps of the car. He slipped and fell face forward from the steps and was injured. He alleged that a porter at the bottom of the steps had failed to assist him. *McBride* held the railroad negligent for, among other things, the failure of its porter to assist a disabled passenger. The court stated, " 'having accepted them [passengers with known disabilities] as passengers, knowing them to be disabled, it is their duty to render such special attention as may be necessary under the circumstances in each case.' " (*McBride* v. *Atchison, Topeka & S.F. Ry. Co., supra,*

44 Cal.2d at p. 120.) However, the court had no occasion to consider a carrier's duty after a passenger had safely disembarked. The court noted that "the carriage of a passenger includes the period during which the passenger is disembarking" (*id.* at p. 116), and applied cases involving passengers who were "boarding or alighting" (*id.* at p. 119). Here, appellant was neither *boarding* nor *alighting* a train. As appellant concedes, he had safely exited the Richmond train. He was left standing on the platform and was not injured at the time he exited. Accordingly, respondent was not responsible for his injuries under the reasoning of *McBride*.[5]

We note finally that the authorities relied upon by the dissent fully support our conclusion that the carrier-passenger relationship had terminated as a matter of law in this case before appellant was injured. *Brandelius* v. *City & County of S.F.* (1957) 47 Cal.2d 729, 734 [306 P.2d 432], and *Riggins* v. *Pacific Greyhound Lines, supra,* 203 Cal.App.2d at page 128, indicate that the carrier-passenger relationship continues until the passenger has alighted to a "reasonably" or "relatively" safe place. In *Riggins*, the plaintiff was discharged from a bus onto the shoulder of a road, a few feet away from the traffic. The court concluded that the plaintiff had reached "a relatively safe place," and distinguished a case in which a bus passenger was let out into the middle of a street, " 'a dangerous area.' " (*Riggins* v. *Pacific Greyhound Lines, supra,* at p. 128, citing *Parker* v. *City & County of San Francisco* (1958) 158 Cal.App.2d 597 [323 P.2d 108].) In *Brandelius*, the plaintiffs' decedent, a passenger on a cable car in San Francisco, was forced to alight into the middle of the street in the path of other cable cars, and was struck and killed by one coming in the opposite direction. The evidence supported findings that the decedent was discharged into an unsafe area and had no reasonable opportunity to get away before being hit. The court concluded that it was a question of fact under the circumstances whether the carrier-passenger relationship had terminated before the accident. (*Brandelius* v. *City & County of S.F., supra,* 47 Cal.2d at p. 734.)

The question, then, is whether a railroad platform is more like the shoulder or the middle of a road. The answer is clear. People in the middle of the street are exposed to "active" hazards (*Brandelius* v. *City & County of S.F., supra,* 47 Cal.2d at p. 734) which are " 'mobile' " (vehicles) and " 'animated' " (drivers) (*Marshall* v. *United Airlines, supra,* 35 Cal.App.3d at

---

[5]We note that we are not called upon to apply the case law which holds that a special relationship may be established by a showing of detrimental reliance. In *Andrews* v. *Wells* (1988) 204 Cal.App.3d 533, 540 [251 Cal.Rptr. 344], for example, the court stated that a duty to assist could be based on "special factors such as would give rise to an expectation that assistance would be provided and a showing that due to these factors the victim detrimentally relied upon that expectation or was otherwise dependent upon the defendant for assistance." Appellant alleges no detrimental reliance in this case.

p. 87). They can be seriously injured simply by standing still. People by the side of the road are in no comparable danger. They are subject only to relatively more minor and remote risks, like jostling from other pedestrians and vehicles jumping the curb. They will have to make some *effort*, like jaywalking, to get seriously injured. The same is true of people on railroad platforms, even raised platforms like those in BART stations. BART riders, if they are oblivious to their safety, can fall onto the tracks or place themselves in the path of a train. Fortunately, such accidents are rare. But the fact that accidents can occur on BART platforms does not establish that they are "dangerous" places, because accidents can happen anywhere, and the fact that appellant managed to injure himself on a BART platform does not establish that BART exposed him to "mobile or animated" hazards when it left him standing there.

## C. *Affirmative Duty Triggered by Creating a Situation of Peril*

Appellant contends that even if the special carrier-passenger relationship terminated, respondent should have exercised ordinary care in protecting him from harm. Appellant argues that it is a question of fact whether respondent fulfilled that duty in his case. However, as discussed above, one is not liable in tort for failure to render assistance absent an affirmative duty to act. There is no affirmative duty to act absent a special relationship unless the actor has created a situation of peril increasing the risk of harm. (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 23.) Thus, appellant's "ordinary negligence" claim hinges on the contention that respondent's employees created a situation of peril that increased the risk of harm to him when they ordered him off the train and onto the platform.

However, this contention fails because, as previously noted, a train platform is not a "perilous" place. " '[T]he carrier's station is characterized by none of the hazards incident to the journey itself.' " (*Falls* v. *San Francisco etc. R.R. Co., supra,* 97 Cal. at p. 119.) Accidents can occur on train platforms in unusual circumstances (see *Palsgraf* v. *Long Island R. Co., supra,* 248 N.Y. 339 [162 N.E. 99]), but they are no more perilous than the sidewalk at a busy intersection. If respondent's platform was perilous for appellant, the peril was due solely to his inebriation for which respondent was in no way responsible.

In ruling on respondent's demurrer, the trial court relied on *Stout* v. *City of Porterville* (1983) 148 Cal.App.3d 937 [196 Cal.Rptr. 301]. Appellant contends that *Stout* is distinguishable from the facts of this case. We disagree. In *Stout,* an officer temporarily detained the plaintiff, who was walking along Main Street in the City of Porterville at 1:30 in the morning, to question him

regarding the reason for his presence and the state of his sobriety. The plaintiff alleged that at the time he was voluntarily intoxicated and unable to care for himself. After questioning, the officer released the plaintiff who was later injured when struck by a vehicle driven by a third person. (*Id.* at p. 940.) The plaintiff filed a complaint against the City of Porterville and the officer alleging that his injuries were due to the officer's failure to arrest him or place him in the custody of a detoxification facility. (*Ibid.*) The plaintiff contended that the officer had an affirmative duty to protect him from injury because they had a special relationship, and because the officer returned him to a position of peril when he terminated the detention. (*Id.* at p. 941.)

*Stout* held that the officer owed no affirmative duty to the plaintiff because there is no special relationship between an officer and a detainee, and the plaintiff failed to allege that the officer "took affirmative action which contributed to, increased, or changed the risk which would have otherwise existed." (*Stout* v. *City of Porterville, supra,* 148 Cal.App.3d at p. 945.) The *Stout* court cited *McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453], as an example of a situation in which the defendant created a situation of peril which increased the risk of harm. In *McCorkle,* an officer investigating a traffic accident directed the plaintiff to follow him *into the middle of an intersection* where the plaintiff was hit by another car. The officer was held liable for the plaintiff's injuries. (*Id.* at p. 262.)

The facts here are analogous to those of *Stout* but not to those of *McCorkle.* Appellant was intoxicated at the time of his injuries. He alleges that respondent owed an affirmative duty to take care of him because he was intoxicated. As in *Stout,* appellant fails to plead facts showing that respondent took affirmative action that placed him in a situation of peril of respondent's own making. Appellant was simply directed onto a train platform; he was not placed in harm's way in the middle of an intersection. (Cf. *Brandelius* v. *City and County of S.F., supra,* 47 Cal.2d at pp. 734-736.)

D. *Conclusion*

We conclude that respondent did not owe appellant a duty to assist him off of the train platform. Appellant cites no precedent for the imposition of such a duty, and makes no effort to grapple with the policy considerations involved in the recognition of a duty. (See *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112-113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Hansra* v. *Superior Court* (1992) 7 Cal.App.4th 630, 639-640 [9 Cal.Rptr.2d 216].) One relevant consideration is "the extent of the burden to the defendant" (*Rowland* v. *Christian, supra,* 69 Cal.2d at p. 113), and it is unclear

where the alleged duty in this case would end. The world at large, and not just the train platform, may have been a menace to appellant in his condition. He probably could have injured himself in a hundred different ways before sobering up, and it is not apparent which of these risks respondent would be called upon to eliminate. Appellant does not contend that respondent was obliged to leave him sleeping on the train. Were respondent's employees required to call him a cab for a ride home (in the hope that a cab would accept him)? Were they required to wait with him until the cab pulled up to make sure he did not get in its way? Without a clear limit on the duty appellant posits, we are not persuaded that its imposition would be sound policy.

We must also consider the "consequences to the community" of the duty appellant would have us recognize. (*Rowland* v. *Christian, supra,* 69 Cal.2d at p. 113.) Over a century ago, in the case of *Falls* v. *San Francisco, etc. R. R. Co., supra,* 97 Cal. 114, a jury had awarded damages to the plaintiff for injuries she sustained when she tripped on a station platform while attempting to board a train. Our Supreme Court had this to say in reversing the judgment: " 'The company, as held in some cases, cannot be expected to treat its passengers as children, or to put them under restraint. Passengers must take the responsibility of informing themselves concerning the everyday incidents of railway traveling, and the company could do business upon no other basis.' [Citation.] It is the duty of railroad companies to give their passengers a reasonable time and opportunity to approach and leave their trains, and the duty is reciprocal. Passengers owe it to themselves and to the company to act with reasonable care in alighting from and boarding trains. [Citations.] . . . [¶] The case is a sad one, the injuries and sufferings of the plaintiff being of a most distressing nature, but we cannot, without injustice to the company . . . establish[] an unwarranted and dangerous precedent . . . ." (*Id.* at pp. 120-121.) All of these same thoughts apply with equal force here.

■■■ When a demurrer is sustained without leave to amend, we must decide whether there is a reasonable possibility that the defect can be cured by amendment. If it can, there has been an abuse of discretion; if not, there has been no abuse of discretion and the judgment of dismissal must be affirmed.

"An order sustaining a demurrer without leave to amend will constitute an abuse of discretion if there is any *reasonable possibility* that the defect can be cured by amendment." (*Careau & Co.* v. *Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1387 [272 Cal.Rptr. 387], original italics.) "The burden is on the plaintiffs to demonstrate that the trial court abused its discretion and to show in what manner the pleadings can be amended and

how such amendments will change the legal effect of their pleadings. [Citations.]" (*Id.,* at p. 1388.) This showing may be made for the first time on appeal. (Code Civ. Proc., § 472c; *Careau & Co.* v. *Security Pacific Business Credit, Inc., supra,* at p. 1386.)

 In the trial court, appellant did not appear at the hearing on the demurrer and attempt to demonstrate how he would amend his complaint so as to cure the defects which the trial court found. However, appellant made a motion for reconsideration and attached his proposed first amended complaint. The fatal defect was that the motion was filed late and denied as untimely. We have considered the proposed amended complaint and the facts and arguments and conclude that appellant has not met his burden of demonstrating how he could amend the complaint to state a cause of action. Appellant concludes his reply brief with the assertion that he "can possibly state a cause of action in negligence against BART by supplying omitted allegations." However, he does not identify what those allegations might be. Given appellant's admitted inability to recall how he was injured, and the fact that there were no witnesses to the accident, it is apparent that nothing of substance can be added. "[T]here is nothing in the general rule of liberal allowance of pleading amendment which 'requires an appellate court to hold that the trial judge abused his [*sic*] discretion if on appeal the plaintiffs can suggest no legal theory or state of facts which they wish to add by way of amendment.' [Citation.]" (*Careau & Co.* v. *Security Pacific Business Credit, Inc., supra,* 222 Cal.App.3d at pp. 1387-1388.) Therefore, the trial court did not abuse its discretion in sustaining the demurrer without leave to amend.

## III. DISPOSITION

The judgment in favor of respondent is affirmed. Respondent is to recover its costs on appeal.

Anderson, P. J., concurred.

**POCHÉ, J.,** Dissenting.—Torts 101B (second semester). Objective exam. Plaintiff's complaint for negligence against San Francisco Bay Area Rapid Transit District (BART) alleges that plaintiff, a paying passenger, was ordered off a BART train at the Richmond station. At that time plaintiff was inebriated to the point of incapacity and BART was fully aware of this. Plaintiff was injured at the station because BART "negligently moved the train and otherwise failed to protect [him]." BART files a general demurrer.

The demurrer should be: (a) sustained without leave to amend because as a matter of law once plaintiff alighted from the BART train he was no longer a passenger and BART owed him no further duty; or, (b) overruled.

According to the majority you flunked the course if you picked (b). I would vote to flunk you if you picked (a) and therefore I respectfully dissent.

A common carrier, of course, owes its passengers the highest degree of care. That duty does not end mechanically when the passenger alights safely from the carrier's vehicle. Instead, it ends " 'when the passenger is discharged into a relatively safe space . . . .' " (*Riggins* v. *Pacific Greyhound Lines* (1962) 203 Cal.App.2d 125, 128 [21 Cal.Rptr. 336].) In particular our Supreme Court has explained that the rule of utmost care and diligence applies " 'until the passenger reaches a place outside the sphere of any activity of the carrier which might reasonably constitute a mobile or animated hazard to the passenger.' " (*Brandelius* v. *City & County of S.F.* (1957) 47 Cal.2d 729, 735 [306 P.2d 432].)

In applying that test this district has held that "[t]he moving vehicles and the jet and propeller air blasts of an airline's landing area rather clearly present a 'mobile or animated hazard' to an arriving or departing passenger" and that the highest degree of care applies "when the passenger enters and until he leaves that locality." (*Marshall* v. *United Airlines* (1973) 35 Cal.App.3d 84, 87 [110 Cal.Rptr. 416].) Does it strain the imagination to hold that the Richmond BART station, with its incoming and departing trains, its electrified third rail, and its pits in which the trains are located, was an area within the sphere of an activity of BART which might reasonably constitute a mobile or animated hazard to a passenger so drunk that he was pouring the contents of his vodka bottle on his trousers? Is there any doubt that BART, which had full knowledge of the passenger's condition, had the duty of utmost care to that passenger?

In my view the plaintiff stated a cause of action for negligence against BART. I would reverse the judgment of dismissal with directions to overrule the demurrer.

Appellant's petition for review by the Supreme Court was denied November 12, 1997. Werdegar, J., was of the opinion that the petition should be granted.