[No. B115766. Second Dist., Div. Three. May 31, 2000.]

MELISSA RAKESTRAW et al., Plaintiffs and Appellants, v. CALIFORNIA PHYSICIANS' SERVICE, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part V B.(1), (2), (3) and (4).

40

**COUNSEL**

Ivie, McNeill & Wyatt, Robert H. McNeill, Jr., and Jay R. Taylor for Plaintiffs and Appellants.

Susan Berke Fogel for California Women's Law Center, California Women Lawyers, Women Lawyers Association of Los Angeles, The Employment

Law Center and Equal Rights Advocates as Amici Curiae on behalf of Plaintiffs and Appellants.

Hassard Bonnington, Rick C. Zimmerman and B. Thomas French for Defendant and Respondent.

Epstein Becker & Green and William A. Helvestine for The California Association of Health Plans as Amicus Curiae on behalf of Defendant and Respondent.

OPINION

KITCHING, J.—

I

INTRODUCTION

This appeal presents the issue whether a private health care service plan contract requiring a $1,000 copayment for inpatient hospital services in connection with pregnancy and child delivery violates the prohibition against the use of copayments "because of sex" in the Knox-Keene Health Care Service Plan Act of 1975 (the Knox-Keene Act). (Health & Saf. Code, § 1340 et seq.)[1] We find it does not. The Knox-Keene Act allows health care service plans to limit coverage for pregnancy-related services and also generally allows copayments, subject to some exceptions. Furthermore, since this health care service plan was not part of plaintiffs' employment compensation and because the Knox-Keene Act specifically governs health care service plans, cases prohibiting employment discrimination because of pregnancy have no relevance to this appeal. We conclude that the trial court correctly sustained a demurrer to the third amended complaint, and that plaintiffs have not met their burden of showing they can amend to cure the defect in their complaint. We therefore affirm the judgment.

II

STANDARD OF REVIEW

█ A demurrer tests the legal sufficiency of factual allegations in a complaint. (*Title Ins. Co. v. Comerica Bank—California* (1994) 27 Cal.App.4th

---

[1]Unless otherwise specified, statutes in this opinion refer to the Health and Safety Code.

800, 807 [32 Cal.Rptr.2d 735].) In reviewing the sufficiency of a complaint against a general demurrer, this court treats the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. This court also considers matters that may be judicially noticed. When a demurrer is sustained, this court determines whether the complaint states facts sufficient to constitute a cause of action. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

On appeal, a plaintiff bears the burden of demonstrating that the trial court erroneously sustained the demurrer as a matter of law. This court thus reviews the complaint de novo to determine whether it alleges facts stating a cause of action under any legal theory. Because a demurrer tests the legal sufficiency of a complaint, the plaintiff must show the complaint alleges facts sufficient to establish every element of each cause of action. If the complaint fails to plead, or if the defendant negates, any essential element of a particular cause of action, this court should affirm the sustaining of a demurrer. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879-880 [6 Cal.Rptr.2d 151].)

When a demurrer is sustained without leave to amend, this court decides whether a reasonable possibility exists that amendment may cure the defect; if it can we reverse, but if not we affirm. The plaintiff bears the burden of proving there is a reasonable possibility of amendment. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.) The plaintiff may make this showing for the first time on appeal. (*Schultz v. Harney* (1994) 27 Cal.App.4th 1611, 1623 [33 Cal.Rptr.2d 276]; *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1386-1388 [272 Cal.Rptr. 387].)

To satisfy that burden on appeal, a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." (*Goodman y. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) The assertion of an abstract right to amend does not satisfy this burden. (*McKelvey v. Boeing North American, Inc.* (1999) 74 Cal.App.4th 151, 161 [86 Cal.Rptr.2d 645].) The plaintiff must clearly and specifically set forth the "applicable substantive law." (*Community Cause v. Boatwright* (1981) 124 Cal.App.3d 888, 897 [177 Cal.Rptr. 657]) and the legal basis for amendment, i.e., the elements of the cause of action and authority for it. Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action. (*McMartin v. Children's Institute International* (1989) 212

Cal.App.3d 1393, 1408 [261 Cal.Rptr. 437]; *McGettigan v. Bay Area Rapid Transit Dist.* (1997) 57 Cal.App.4th 1011, 1024 [67 Cal.Rptr.2d 516].) Allegations must be factual and specific, not vague or conclusionary. (*Cooper v. Equity Gen. Insurance* (1990) 219 Cal.App.3d 1252, 1263-1264 [268 Cal.Rptr. 692].)

The burden of showing that a reasonable possibility exists that amendment can cure the defects remains with the plaintiff; neither the trial court nor this court will rewrite a complaint. (*Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1153 [37 Cal.Rptr.2d 718].) Where the appellant offers no allegations to support the possibility of amendment and no legal authority showing the viability of new causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend. (*New Plumbing Contractors, Inc. v. Nationwide Mutual Ins. Co.* (1992) 7 Cal.App.4th 1088, 1098 [9 Cal.Rptr.2d 469]; *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 513, fn. 3 [125 Cal.Rptr. 365, 542 P.2d 237].)

III

FACTS

Defendant California Physicians' Service, doing business as Blue Shield of California (Blue Shield) filed a demurrer to the third amended complaint filed by plaintiffs Melissa Rakestraw and Thomas Rakestraw (the Rakestraws) and other plaintiffs not parties to this appeal. The Rakestraws' breach of contract cause of action alleged that Blue Shield violated several statutes in the Knox-Keene Act. The complaint alleged the following facts.

The Rakestraws are husband and wife. They paid premiums for continuous coverage under a "Personal HMO Individual and Family Health Plan" issued by Blue Shield. Jointly insured under the policy, they share a single subscriber/certificate number. Their plan was a "health care service plan" subject to regulation under the Knox-Keene Act. Blue Shield, a joint venture of California Physicians Insurance Corporation and California Physicians' Insurance, offers prospective insureds numerous health insurance plans. Blue Shield operates as a health care service plan regulated by the Department of Corporations under the Knox-Keene Act.

The third amended complaint attached a copy of the health care service plan contract. The complaint alleged that commissioners of the Department

of Insurance and Department of Corporations reviewed and approved the policy forms and evidence of coverage, and have issued notices and undertaken various enforcement actions to compel compliance with California statutes and regulations.

The complaint does not state when the Blue Shield contract began to provide health insurance for plaintiffs, but coverage began before the Rakestraws' son was born on July 26, 1995.

The "Pregnancy, Maternity Care and Family Planning" portion of the Rakestraws' contract required a $1,000 copayment for each inpatient hospital admission that resulted in a delivery of a child. This part of the contract stated: "Effective on or after April 1, 1993, for each Hospital admission that results in delivery, there is a $1,000.00 Copayment applicable to the Inpatient Hospital Services (not applicable to Inpatient Physician Services)." A schedule of charges for services associated with pregnancy, maternity care, and family planning included no charge for prenatal and postnatal physician office visits, and no charge for inpatient physician services for normal delivery, cesarean section, and complications of pregnancy. For "[a]ll necessary Inpatient Hospital and ancillary Services," the contract described the charges as: "After $1,000.00 Copayment, 20% of Allowed Charges."

St. Joseph Hospital, where Melissa Rakestraw was hospitalized during her delivery, provided $3,648.95 in hospital services. Blue Shield allowed $897 for inpatient hospital services. Because this amount was less than the $1,000 copayment, Blue Shield disclaimed any obligation to pay for those services.

IV

ISSUES

The main issue in this appeal is whether a health care service plan contract, which is not part of an employment relationship and which requires a $1,000 copayment for inpatient hospitalization that results in a delivery of a child, violates the prohibition against subjecting contractual benefits or coverage to copayments "because of sex" in section 1365.5, subdivision (b) of the Knox-Keene Act.

The unpublished portion of this opinion addresses other issues raised by the Rakestraws.

V

DISCUSSION

A. *The Knox-Keene Act Permits the $1,000 Maternity Copayment*

The Rakestraws contend that Blue Shield's policy discriminates on the basis of sex by requiring a $1,000 copayment for maternity care in violation of the Knox-Keene Act. We first analyze relevant statutes in the Knox-Keene Act, and then address whether a copayment for pregnancy-related medical care violates the prohibition in the Knox-Keene Act against subjecting contractual benefits or coverage to copayments "because of sex."

(1) *The Knox-Keene Act Allows Copayments in General, and Specifically Allows Copayments for Maternity Services*

As the complaint alleges, the Blue Shield contract is a health care service plan. ▇▇ The Knox-Keene Act applies to health care service plan contracts as defined in section 1345, subdivision (f).[2] (§ 1343, subd. (a).) The Knox-Keene Act makes the Commissioner of Corporations responsible for administration and enforcement. (§ 1341; *Williams v. California Physicians' Service* (1999) 72 Cal.App.4th 722, 729 [85 Cal.Rptr.2d 497].) The Legislature vested this responsibility in the Commissioner of Corporations to ensure proper fiscal management of health care service plans by giving regulation of those plans a strong financial and business orientation. (*Van de Kamp v. Gumbiner* (1990) 221 Cal.App.3d 1260, 1274 [270 Cal.Rptr. 907].)

▇▇ Health care service plans must meet requirements in section 1367. Subdivision (i) of section 1367 requires health care service plan contracts to provide subscribers and enrollees all the "basic health care services" included in section 1345, subdivision (b). " 'Basic health care services' "

---

[2]Section 1345, subdivision (f) defines "[h]ealth care service plan" as either of the following:

"(1) Any person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees.

"(2) Any person, whether located within or outside of this state, who solicits or contracts with a subscriber or enrollee in this state to pay for or reimburse any part of the cost of, or who undertakes to arrange or arranges for, the provision of health care services that are to be provided wholly or in part in a foreign country in return for a prepaid or periodic charge paid by or on behalf of the subscriber or enrollee."

defined in section 1345, subdivision (b)(2) include "[h]ospital inpatient services." The corresponding administrative regulation likewise defines "[i]npatient hospitalization services" to mean "short-term general hospital services." (Cal. Code Regs., tit. 10, § 1300.67, subd. (b).) Thus "basic health care services" appears to include hospital inpatient services in connection with maternity and childbirth.

Assuming that maternity hospital inpatient services are basic health care services, section 1367 allows a health care service plan to charge a deductible or copayment[3] for basic health care services. Section 1367, subdivision (i) states in part: "[n]othing in this chapter shall prohibit a health care service plan from charging subscribers or enrollees a copayment or a deductible for a basic health care service or from setting forth, by contract, limitations on maximum coverage of basic health care services, provided that the copayments, deductibles, or limitations are reported to, and held unobjectionable by, the director and set forth to the subscriber or enrollee pursuant to the disclosure provisions of Section 1363." (See also Cal. Code Regs., tit. 10, § 1300.45, subd. (g).) The administrative regulations also make the provision of basic health care services subject to a copayment if the commissioner approves. (Cal. Code Regs., tit. 10, § 1300.67.)

In addition, the Knox-Keene Act specifically allows health care service plans to charge copayments for maternity services. Conditional language in section 1373.4[4] shows that a health care service plan may contain a maternity deductible. Section 1373.4 regulates and limits the scope of maternity deductibles, but it does not prohibit them.

---

[3]We treat the term "deductible" as synonymous with the $1,000 "copayment" in the Blue Shield contract. That contract defined "copayment" as "the amount which a Member is required to pay for certain Benefits." Title 10 of the California Code of Regulations sets forth administrative regulations for health care service plans pursuant to the Knox-Keene Act. Those administrative regulations define "copayment" as "an additional fee charged to a subscriber or enrollee which is approved by the Commissioner, provided for in the plan contract and disclosed in the evidence of coverage or the disclosure form used as the evidence of coverage." (Cal. Code Regs., tit. 10, § 1300.45, subd. (g).) Another administrative regulation, governing contractual disclosure requirements, states that contracts shall include "[a]ppropriate captions, in boldface type, for the following provisions: limitations, exclusions, exceptions, reductions, deductibles, copayments and other provisions which may decrease or limit benefits to, or increase costs of, any subscriber or enrollee[.]" (Cal. Code Regs., tit. 10, § 1300.67.4, subd. (a)(3).) Other statutes in the Knox-Keene Act use "deductible" and "copayment" synonymously. Section 1373.96, subdivision (f), for example, refers to the "payment of copayments, deductibles, or other cost sharing components by the enrollee."

[4]Section 1373.4, enacted in 1976, specifically addresses maternity benefits and maternity deductibles. It states, in relevant part: *"No health care service plan which provides maternity benefits* for a person covered continuously from conception shall be issued, amended, delivered, or renewed in this state on or after July 1, 1976, if it contains any exclusion, reduction, or other limitations as to coverage, deductibles, or coinsurance provisions as to

Thus the Knox-Keene Act allows copayments, deductibles, and limitations on coverage, subject to statutory restrictions, the commissioner's approval, and disclosure requirements. The Knox-Keene Act, however, contains another statute, section 1365.5, that prohibits copayments in specific circumstances. This appeal primarily concerns whether the $1,000 copayment in the Blue Shield plan violates section 1365.5.

(2). *The Legislature's Enactment of Section 1365.5 Did Not Prohibit the Maternity Services Copayment*

Section 1365.5 prohibits a health care service plan contract from altering the contract or limiting benefits or coverage because of a contracting party's "sex," among other categories. The statute does not identify maternity or pregnancy as one of these categories. Subdivision (b) of section 1365.5 states: "The terms of any contract shall not be modified, and the benefits or coverage of any contract shall not be subject to any limitations, exceptions, exclusions, reductions, copayments, coinsurance, deductibles, reservations, or premium, price, or charge differentials, or modifications because of the race, color, national origin, ancestry, religion, *sex,* marital status, sexual orientation, or age of any contracting party, potential contracting party, or person reasonably expected to benefit from that contract as a subscriber, enrollee, member, or otherwise; except that premium, price, or charge differentials because of the sex or age of any individual when based on objective, valid, and up-to-date statistical and actuarial data are not prohibited. Nothing in this section shall be construed to permit a health care service plan to charge different premium rates to individual enrollees within the same group solely on the basis of the enrollee's sex." (Italics added.)

The Rakestraws allege that the Blue Shield maternity copayment violates section 1365.5, subdivision (b) because it makes a benefit or coverage of the contract subject to a copayment "because of the . . . sex" of a contracting party. The Rakestraws argue that this court should define the prohibition

involuntary complications of pregnancy, unless such provisions apply generally to all benefits paid under the plan. . . . *Where the plan contains a maternity deductible,* the maternity deductible shall apply only to expenses resulting from normal delivery and cesarean section delivery; however, expenses for cesarean section delivery in excess of the deductible shall be treated as expenses for any other illness under the plan.

"*Where a plan which provides or arranges direct health care services for its members contains a maternity deductible,* the maternity deductible shall apply only to expenses resulting from prenatal care and delivery. However, expenses resulting from any delivery in excess of the deductible amount shall be treated as expenses for any other illness under the plan. If the pregnancy is interrupted, *the maternity deductible* charged for prenatal care and delivery shall be based on the value of the medical services received, providing that it is never more than two-thirds of *the plan's maternity deductible.*" (Italics added.)

against charging a copayment "because of sex" to include charging a copayment "because of pregnancy." The Rakestraws, however, have no relevant legal authority for this argument. The Rakestraws' California authorities derive from California statutes and from a California constitutional provision prohibiting discrimination *in employment* because of sex. Outside California, the Rakestraws' authorities derive from federal civil rights statutes and from non-California state constitutional provisions and statutes that have no analogy in California law. The Rakestraws offer no authority showing that the California Legislature intended to include pregnancy within the prohibition against subjecting contractual benefits or coverage to a copayment "because of sex."

The Rakestraws' main California authority, *Badih v. Myers* (1995) 36 Cal.App.4th 1289 [43 Cal.Rptr.2d 229], is an employment discrimination case. In *Badih*, the plaintiff sued Myers, her employer, for wrongful discharge in contravention of public policy. Among other claims, Badih alleged that when she told Myers she was pregnant, he terminated her employment. The jury agreed and awarded judgment in Badih's favor. On appeal, both parties agreed that Government Code statutes prohibiting discrimination in employment because of pregnancy did not apply to the defendant because he employed fewer than five employees. (Gov. Code, § 12926, subd. (d).) Thus Fair Employment and Housing Act statutes prohibiting pregnancy discrimination in employment did not apply to Myers. *Badih* instead relied on article I, section 8 of the California Constitution to hold pregnancy discrimination to be a form of sex discrimination in employment. The constitutional provision expressed a fundamental public policy against sex discrimination in employment, which allowed plaintiff to maintain a cause of action for wrongful discharge in contravention of public policy. (*Badih, supra,* 36 Cal.App.4th at pp. 1295-1296.)

Article I, section 8 of the California Constitution states: "A person may not be disqualified *from entering or pursuing a business, profession, vocation, or employment* because of sex, race, creed, color, or national or ethnic origin." (Italics added.) As the italicized wording indicates, this section concerns employment.

The Rakestraws purchased the Blue Shield health care service plan contract as individual subscribers; they were not insured as members of a group policy provided by an employer, and their employer did not provide the Blue Shield health care service plan as part of their employment compensation. Unlike some other states, the Constitution of California contains no other provision giving the Rakestraws a basis for claiming that the Blue Shield

contract violated a "fundamental substantial public policy embodied in the state Constitution." (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 90 [276 Cal.Rptr. 130, 801 P.2d 373].) As we have seen, the relevant statutory scheme is the Knox-Keene Act, which does not prohibit the $1,000 maternity copayment. As an employment discrimination case, *Badih v. Myers* has no application to this appeal.

Federal anti-pregnancy-discrimination cases cited by the Rakestraws likewise derive from employment law or otherwise provide no basis for the definition of sex discrimination which the Rakestraws advocate. *Geduldig v. Aiello* (1974) 417 U.S. 484 [94 S.Ct. 2485, 41 L.Ed.2d 256] involved the constitutionality of a pregnancy exclusion in California's disability insurance law. Because California Unemployment Insurance Code section 2626 excluded certain disabilities attributable to pregnancy from coverage under the disability insurance system, the state department administering the disability insurance system ruled the plaintiff ineligible for benefits. (417 U.S. at pp. 487-492 [94 S.Ct. at pp. 2487-2490].) *Geduldig* held that excluding this pregnancy from coverage did not invidiously discriminate under the equal protection clause. The court found that the state's interest in maintaining a self-supporting insurance program, in providing adequate benefits for covered disabilities, and in maintaining an affordable contribution rate provided "an objective and wholly non-invidious basis for the State's decision not to create a more comprehensive insurance program than it has." (*Id.* at p. 496 [94 S.Ct. at p. 2492].) Thus the plaintiff had not shown she suffered discrimination because she encountered a risk outside the program's protection. (*Id.* at p. 497 [94 S.Ct. at p. 2492].)

*Geduldig* was an equal protection case, and the majority opinion did not refer to federal anti-discrimination-in-employment statutes. Nonetheless in 1976 the United States Supreme Court relied on the *Geduldig* analysis to hold that an employer's failure to provide disability benefits to pregnant employees did not constitute sex discrimination in violation of title VII of the Civil Rights Act of 1964. (42 U.S.C. § 2000e et seq., hereafter sometimes title VII.) In *General Electric Co. v. Gilbert* (1976) 429 U.S. 125 [97 S.Ct. 401, 50 L.Ed.2d 343], the defendant employer's disability plan excluded plaintiffs' pregnancy-related disabilities from coverage. Section 703(a)(1) of title VII (42 U.S.C. § 2000e-2(a)(1)) made it an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" *Gilbert* held that excluding pregnancy from a disability-benefits plan providing general coverage was not gender-based discrimination, where

there was no showing that the exclusion of pregnancy benefits was a pretext designed to effect invidious discrimination against members of one sex or the other. (*Gilbert, supra.* 429 U.S. at p. 136 [97 S.Ct. at p. 408].) Applying the reasoning of *Geduldig*, the *Gilbert* opinion stated: "As there is no proof that the package is in fact worth more to men than to women, it is impossible to find any gender-based discriminatory effect in this scheme simply because women disabled as a result of pregnancy do not receive benefits; that is to say, gender-based discrimination does not result simply because an employer's disability-benefits plan is less than all-inclusive. . . . [P]regnancy-related disabilities constitute an *additional* risk, unique to women, and the failure to compensate them for this risk does not destroy the presumed parity of the benefits, accruing to men and women alike, which results from the facially evenhanded *inclusion* of risks." (*Gilbert, supra,* 429 U.S. at pp. 138-139 [97 S.Ct. at pp. 409-410], fn. omitted, italics in original.)

The United States Congress responded to *Gilbert* by enacting the Pregnancy Discrimination Act in 1978, which amended title VII to specifically include pregnancy as a prohibited basis of discrimination "because of sex" or "on the basis of sex."[5] (*Newport News Shipbuilding & Dry Dock v. EEOC* (1983) 462 U.S. 669, 678 [103 S.Ct. 2622, 2628, 77 L.Ed.2d 89].) This amendment broadened the scope of title VII protection. But it did so only with respect to the " 'compensation, terms, conditions, or privileges of employment.' " (*Newport News Shipbuilding, supra,* 462 U.S. at p. 682 [103 S.Ct. at p. 2630].)

The prohibition in section 1365.5 against subjecting contractual benefits or coverage to a copayment "because of sex" does not specifically identify pregnancy. Thus the California Legislature, in regulating health care service plans, has not taken the step the United States Congress took in regulating employment. Title VII, a federal statute governing employment discrimination, does not provide authority for this court to rewrite the Knox-Keene Act to prohibit a maternity copayment. "An insurer does not have a duty to do business with or issue a policy of insurance to any applicant for insurance. Whether an insurer should be required to offer a particular class of insurance or insure particular risks are matters of complex economic policy entrusted

---

[5] Title 42 of the United States Code section 2000e(k) states, in relevant part: "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, child birth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise."

to the Legislature." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 43 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

The Rakestraws also rely on cases from other states. *Civil Rights Com'n v. Travelers Ins.* (Colo. 1988) 759 P.2d 1358 involved a medical insurance policy that was part of the compensation paid to plaintiff employee by her employer. The decision relied on a Colorado statute forbidding an employer from discriminating in matters of compensation based on sex. (*Id.* at p. 1361.) The *Civil Rights Com'n* case, moreover, relied on an "equal rights" provision of the Colorado State Constitution[6] that has no counterpart in the California Constitution. (*Civil Rights Com'n* at p. 1363.) *Quaker Oats Co. v. Cedar Rapids Hum. R. Com'n* (Iowa 1978) 268 N.W.2d 862, 864-867 and *Mass. Elec. v. Mass. Com'n Against Discrim.* (1978) 375 Mass. 160 [375 N.E.2d 1192, 1198-1199], also cited by the Rakestraws, are likewise distinguishable because they involved disability insurance policies provided by employers as compensation to employees, and relied on anti-discrimination-in-employment statutes.

*Bankers Life & Cas. Co. v. Peterson* (1993) 263 Mont. 156 [866 P.2d 241] held that an individual medical insurance policy that excluded coverage for normal pregnancy and childbirth violated Montana statute section 49-2-309, Montana Code Annotated (MCA).[7] As the opinion points out, the Montana statute "has no federal or sister-state counterpart." (866 P.2d at p. 243.) *Bankers Life* differs factually from this appeal insofar as the insurance policy at issue in *Bankers Life* completely excluded normal pregnancy and child birth from coverage, and did not involve a copayment or deductible. (*Id.* at p. 242.) It is legally distinguishable because unlike the Knox-Keene Act, which specifically regulates health care service plans and allows copayments for maternity benefits, the Montana insurance statute on which *Bankers Life* relied had no accompanying statutory scheme allowing such copayments.

In the Knox-Keene Act, the Legislature enacted a statutory scheme that specifically governs health care service plans, and placed regulatory authority over this subject matter with the Commissioner of Corporations. By these

---

[6]Article II, section 29 of the Colorado Constitution states: "Equality of rights under the law shall not be denied or abridged by the state of Colorado or any of its political subdivisions on account of sex."

[7]MCA section 49-2-309, provides in pertinent part: "(1) It is an unlawful discriminatory practice for a financial institution or person to discriminate solely on the basis of sex or marital status in the issuance or operation of any type of insurance policy, plan, or coverage or in any pension or retirement plan, program, or coverage, including discrimination in regard to rates or premiums and payments or benefits."

steps, the Legislature intended the Knox-Keene Act, and not some other statutory scheme, to govern health care service plans. The Rakestraws can cite no legal authority to show that the Legislature, in the Knox-Keene Act, intended also to include pregnancy in the prohibition against the use of a copayment "because of sex." The existence of a statute such as Government Code section 12945, in which the Legislature specifically prohibited employment discrimination because of pregnancy, argues against importing that prohibition into the Knox-Keene Act, which confines itself to prohibiting copayments "because of sex." (See *Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 596 [262 Cal.Rptr. 46, 778 P.2d 174].) Given the California Constitution and existing statutes, this policy determination rests with the Legislature, to which body this court must leave any change in that determination.

B.   *Other Issues*

(1)-(4)*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## VI

### CONCLUSION

We conclude that the complaint has not stated a cause of action for breach of contract based on a violation of the Knox-Keene Act or any other statutes. Moreover, the Rakestraws have not provided adequate legal authority or factual allegations, as required in the standard of review portion of this opinion, to satisfy their burden of showing that there is a reasonable possibility that they can amend the legal effect of their complaint. We therefore affirm the judgment.

## VII

### DISPOSITION

The judgment is affirmed. Costs on appeal awarded to defendant.

Croskey, J., concurred.

---

*See footnote, *ante*, page 39.

**KLEIN, P. J.**—I respectfully dissent.

I would reverse the judgment because there is a reasonable possibility the complaint can be amended to allege that the Blue Shield contract violated the Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq.)[1]

Section 1365.5 prohibits a health care service plan contract from altering the contract or limiting benefits or coverage because of a contracting party's "sex," among other categories. California law recognizes that "pregnancy discrimination is a form of sex discrimination under article I, section 8 of the California Constitution" (*Badih v. Myers* (1995) 36 Cal.App.4th 1289, 1296 [43 Cal.Rptr.2d 229]), first adopted in 1879. (Cal. Const., former art. XX, § 18; *Matter of Maguire* (1881) 57 Cal. 604, 605; *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 8 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351].) The fact that *Badih* is an employment case in no way detracts from its conclusion that pregnancy discrimination amounts to sex discrimination within the meaning of the California Constitution. It therefore follows that differential treatment on the basis of pregnancy likewise amounts to discrimination on the basis of sex within the meaning of section 1365.5.

Further, *Bankers Life & Cas. Co. v. Peterson* (1993) 263 Mont. 156 [866 P.2d 241], which the majority opinion attempts to distinguish, is highly pertinent and persuasive. The statute in issue, Montana Code Annotated section 49-2-309, "prohibits discrimination *based solely on sex* in the issuance, operation, coverage, rates or premiums of any type of insurance policy." (866 P.2d at p. 241, italics added.) That statute, like section 1365.5, *does not use the term pregnancy*. The issue presented was whether an individual major-medical-expense insurance policy that excluded coverage for normal pregnancy and childbirth violated Montana Code Annotated section 49-2-309. (866 P.2d at p. 241.) The Montana Supreme Court concluded that "discrimination on the basis of pregnancy is discrimination on the basis of sex and is, therefore, prohibited by the Montana unisex insurance statute." (*Id.*, at p. 245.)

The court reasoned "[p]regnancy is a condition unique to women, and the ability to become pregnant is a primary characteristic of the female sex. Thus, any classification which relies on pregnancy as the determinative criterion is a distinction based on sex . . . By definition, [placing pregnancy in a class by itself] discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male. [Citation.]" (*Bankers Life & Cas. Co. v. Peterson, supra*, 866 P.2d at p. 243.)

---

[1]All further statutory references are to the Health and Safety Code, unless otherwise indicated.

Thus, it is hardly a novel proposition that "differential treatment of pregnancy is gender-based discrimination because only women can become pregnant." (*Bankers Life & Cas. Co. v. Peterson, supra*, 866 P.2d at p. 243.)

The majority opinion emphasizes the statute construed in *Bankers Life* "has no federal or sister-state counterpart." (*Bankers Life & Cas. Co. v. Peterson, supra*, 866 P.2d at p. 243.) The fact that Montana Code Annotated section 49-2-309 applies only to Montana is a distinction without a difference. Both Montana section 49-2-309 and section 1365.5 of the Knox-Keene Act prohibit discrimination on the basis of sex, and both cases raise the issue whether differential treatment of pregnancy constitutes discrimination on the basis of sex within the meaning of the statute. Thus, *Bankers Life* is directly on point, is sound in its rationale, and should help guide a proper interpretation of Knox-Keene's prohibition on sex discrimination.

Although section 1365.5 bars gender-based differentials, the prohibition is not absolute. Under the statute, "premium, price, or charge differentials . . . because of the sex or age of any individual *when based on objective, valid, and up-to-date statistical and actuarial data are not prohibited.*" (§ 1365.5, subd. (b), italics added.) Therefore, the question whether a $1,000 copayment for maternity care violates the statute is ultimately one of fact which cannot be resolved at the pleading stage.

A petition for a rehearing was denied June 27, 2000, and appellants' petition for review by the Supreme Court was denied August 16, 2000. Mosk, J., was of the opinion that the petition should be granted.